669 A.2d 1382

RALPH MUELLENBERG AND BIKON-TECHNIK, G.m.B.H., PLAINTIFFS–RESPONDENTS, v. BIKON CORPORATION, DEFENDANT, AND KURT W. BURG, DEFENDANT–APPELLANT, AND ADDA FINANZIARIA, S.R.L. AND DARIO PASSERINI, DEFENDANTS–RESPONDENTS.

Argued September 27, 1995—Decided January 18, 1996.

*Eugene H. Gilmartin* argued the cause for appellant (*Barry G. Leveen*, attorney).

*Frederick A. Nicoll* argued the cause for respondents Ralph Muellenberg and Bikon–Technik, G.m.b.H.

*William F. Campbell, III*, argued the cause for respondents Adda Finanziaria, S.R.L., and Dario Passerini (*Dillon, Bitar & Luther*, attorneys).

The opinion of the Court was delivered by

O'HERN, Justice.

This appeal concerns a court's authority to order shareholders representing a majority of corporate ownership to sell their shares

to a minority shareholder whose rights had been oppressed by the majority. We find that the provisions of the New Jersey Corporation Business Act, *N.J.S.A.* 14A:12–7(1)(c) and 14A:12–7(8), do, in rare circumstances, authorize a buy-out of the majority. Because unfolding events in this case have confirmed the judgment of the Chancery Division that the parties would be unable to cooperate in the joint management of the enterprise, we reinstate its judgment ordering the majority shareholders to sell their interest to a minority shareholder. For purposes of this appeal, we accept generally the facts set forth in the majority shareholders' brief.

## I

Ralph Muellenberg is a mechanical engineer and an inventor. He has held some 80 patents worldwide in the field of locking devices used generally in the building of machines. These are described variously as "shaft to hub connections," "clamping devices" and "locking assemblies." The devices allow component parts of a machine to attach efficiently to a shaft. In 1972, Muellenberg founded Bikon–Technik GmbH (BTG) in Germany to promote products of his invention. BTG owns the trademarks BIKON, DOBIKON, and BIKON–Technik.

Adda Finanziaria, S.R.L. (Adda) is an Italian holding company owned by the defendant Dario Passerini who is also the general manager and a shareholder in another Italian company, Tecnomeccanica S.N.S. di Sacchi & C. (TM).

Kurt Burg is a mechanical engineer who came to the United States in 1976 from Germany and was employed here by a company known as Ringfeder Corp., also in the clamping device business and a competitor of BTG.

Muellenberg's goal was to establish a family of companies related through common ownership and contract to market his products throughout the world. This integrated ownership structure was aimed at assuring quality and sources of supply. By the end of 1992, worldwide sales of Bikon and Dobikon products (collectively "Bikon Products") totaled nearly $5 million. BTG

does not manufacture locking devices itself. In 1979 BTG entered an agreement with TM, which was owned equally by Muellenberg and Adda (Passerini's holding company), to manufacture Bikon products. The agreement provided, among other things, that TM would be the exclusive manufacturer of products for BTG in Italy, that BTG would make specified annual minimum purchases and that BTG would have the exclusive right to sell products manufactured by TM in various countries including the United States (the "Cooperation Agreement"). No royalty or license fees were due to BTG or Muellenberg under the Cooperation Agreement with TM.

Sometime in 1980, Muellenberg and Burg began discussions concerning Burg's possible participation in a United States company to be formed by Muellenberg and Passerini for the promotion and sale of Bikon products in the United States and Canada.[1] Muellenberg had met Burg some years earlier when Burg was a German resident.

To that end Bikon Corp. (BNJ) was incorporated in New Jersey on June 25, 1982. A Stockholders' Agreement provided that Muellenberg, Burg and Passerini would be the initial directors and officers and that Muellenberg would be president. The parties also executed a License Agreement and a Distribution Agreement dated April 12, 1982. The License Agreement granted BNJ the right to exploit Bikon products in the United States in consideration of a license fee to Muellenberg, as owner of the patents, of 5 per cent of the gross receipts of BNJ, payable quarterly.

Pursuant to Burg's request, the Distribution Agreement gave BNJ the right to produce and distribute products developed in accordance with Muellenberg's patents. The Distribution Agreement licensed BNJ to use the common law trademarks BIKON, DOBIKON and the trade name BIKON–Technik in exchange for a fee of 2 per cent of BNJ's gross receipts. BTG also obliged

---

[1] For convenience, we sometimes use the name Passerini to denote the interests of Adda and TM and Muellenberg to denote the interests of BTG.

itself to offer newly developed products in the field of shaft to hub connections to BNJ for distribution in the United States. To ensure quality and protect valuable patent and trademark rights, Muellenberg included in the ·Distribution Agreement a provision requiring that production in the United States be in accordance with drawings and blueprints supplied by BTG which could not be altered without BTG's permission.

Muellenberg, Burg and Passerini subscribed for 100 shares of BNJ stock for $30,000 each. Only Muellenberg invested cash. Burg's subscription was provided in exchange for his knowledge of the trade and Passerini's was credited against merchandise to be manufactured by TM for sale by BNJ. Certificates evidencing ownership of 100 shares of BNJ were issued to Muellenberg, Burg and Passerini.

Muellenberg claims that prior to the formation of Bikon Corp., he made it clear to Burg that he, Muellenberg, was to be in control of the company and would be its president, Burg would be general manager and Passerini would be treasurer. Business operations commenced in Burg's River Vale, New Jersey home. In June 1984, Burg and his wife bought a house with an out-building in Monroe, New York and moved the business there. The out-building was renovated with offices upstairs and a warehouse on the first floor. Eventually, BNJ expanded to a warehouse in Monroe. BNJ always paid rent to Burg and his wife for the office space in River Vale and Monroe ($1350/month in 1992).

Despite differences that developed between Muellenberg and Burg, the business prospered. As General Manager and the only officer on site on a regular basis, Burg handled the day-to-day business of BNJ. Muellenberg claims that Burg acted as though he had exclusive control over the business. Disputes arose about the introduction of new products into the BNJ line, the patent and trademark royalty fees, the rent that Burg paid to himself, and Muellenberg's desire to see detailed reports of sales and activities.

Muellenberg also complained that when Passerini fell behind in production capacity, Burg went to Italy without notice to Muellen-

berg and unilaterally engaged other suppliers. Muellenberg regarded some of them as direct competitors and did not want them to threaten his interests. He viewed introduction into the United States of the Bikon products produced by unlicensed manufacturers as a violation of his patent rights. Burg countered that Passerini had encouraged him to engage the other contractors with Muellenberg's tacit approval.

At first Passerini appeared neutral or inactive. A question arose concerning Passerini's fulfillment of his capital subscription. Claiming that the corporation was deadlocked, Muellenberg instituted these proceedings in the Chancery Division, seeking a dissolution of the corporation and other relief. Burg counterclaimed, seeking to confirm that Passerini was not a shareholder and to compel Muellenberg to sell his stock to Burg.

When Passerini resumed his role, notice was given of a meeting of the shareholders and directors to be held on January 20, 1993, to consider dissolution. On Burg's application, the Chancery Division enjoined any action to dissolve, but not the meeting. Muellenberg and Passerini traveled from Europe to attend the meeting. BNJ's secretary attempted to persuade Burg to attend either by telephone or in person. When Burg refused, the meeting proceeded in his absence.

At that meeting, Muellenberg and Passerini voted to declare a dividend of $180,000 ($600 per share), to retain an outside accountant to determine accrued royalties, to require the signatures of Burg and Muellenberg or Muellenberg alone for future bank withdrawals, and to require Board approval for the selection of suppliers and purchases over $1,000.[2] Muellenberg and Passerini assumed that they had regained control of BNJ and dismissed their court actions, except for their application to purchase Burg's

---

[2] On Burg's motion, the Chancery Division enjoined the payment of the dividend and modified the requirements for approval of purchases over $1,000. The court also modified the banking arrangements.

stock. The ensuing disputes were tried over eleven days between May 10, 1993 and June 22, 1993.

At trial, the court found that Passerini was a stockholder, having paid for his stock in the transfer of goods. The issues it posed for decision were: (1) Had defendant Burg proven a triggering event under *N.J.S.A.* 14A:12–7 authorizing a buy-out of shares or dissolution, and (2) if a triggering event occurred, should a sale of stock be directed and, if so, from whom to whom? After reviewing the various claims of oppression and mismanagement, the court found that at the January 20, 1993, shareholders' meeting, Muellenberg and Passerini had begun efforts to freeze out Burg. They had declared a $180,000 dividend that they should have known would deprive Bikon of needed cash to operate and thus take away Burg's ability to perform successfully as general manager. In addition, despite the lack of any showing of abuse by Mr. Burg in operating the company, they began to strip Burg of his day-to-day control as general manager by resolving that bank account withdrawals should be made only by plaintiff or by joint signatures of plaintiff and defendant Burg. And, finally, the court found that the majority directors, as "[p]laintiff's counsel acknowledged ... in summation," intended to vote Burg out as a director and terminate him as general manager and employee of the company.

The trial court determined that this course of conduct amounted to oppression. It held that the only fair and equitable remedy under the circumstances was to have one or more of the parties buy the stock of the others. The court concluded that Burg should buy out the interests of Muellenberg and Passerini. The parties agreed on the value of the stock. No stay of the order of the Chancery Division having been obtained, Burg tendered $235,-000 each to Muellenberg and Passerini and thereafter changed the name of the corporation to B–Loc Corporation.

On appeal, the Appellate Division reversed and remanded the portion of the trial court's judgment ordering the sale of the shares of Muellenberg and Adda to Burg and terminating Muel-

lenberg and Passerini as corporate officers and directors. It found that the Chancery Division's holding that the facts satisfy the oppression and unfairness standards of *N.J.S.A.* 14A:12–7(1)(c) was "premature and, therefore, erroneous as a matter of law."

It is not sufficient that Muellenberg and Passerini "had started to freeze out" Burg. The statutory remedies of dissolution or buy-out, available when oppression or unfairness has occurred, are so terminal in the context of a corporation's life, that a court should be loathe to reach either result except as a last resort. *See Brenner v. Berkowitz,* 134 *N.J.* 488, 510–15 [634 *A.*2d 1019] (1993). * * * Before ordering so extreme a remedy as a buy-out, other less harsh remedies could have been applied.

[*Muellenberg v. Bikon Corp.,* 277 *N.J.Super.* 67, 75–76, 648 *A.*2d 1161 (App.Div. 1994) (citation omitted).]

The Appellate Division held that the trial court should have given the parties an opportunity to operate under their newly adopted governance structure before declaring an impasse. It reasoned that "there was always the possibility that the parties might, out of self-interest, find a way to resolve their differences so as to preclude a maturing 'freeze out' from actually occurring, or that they might be assisted in doing so by orders of the court less extreme than dissolution or buy-out." *Id.* at 76, 648 *A.*2d 1161. Because requiring majority shareholders to sell their interests to a minority shareholder is so contrary to our laws' majoritarian principles of corporate governance, the Appellate Division said courts should contemplate such relief only when "extraordinary equitable considerations and unavoidable consequences" arise.

Defendant Burg petitioned this Court for certification, arguing that the Appellate Division incorrectly limited the scope of *N.J.S.A.* 14A:12–7, improperly invoked a majoritarian principle of corporate governance with respect to a close corporation, and erroneously rejected the decision of the trial court. We granted Burg's petition for certification, 142 *N.J.* 448, 663 *A.*2d 1356 (1995), and stayed the effect of the Appellate Division's opinion until we had reviewed it. We now reverse and reinstate the judgment of the Chancery Division.

## II

Unlike their counterparts in a publicly held corporation, shareholders in a close corporation are typically involved in the management and operation of the company. Oftentimes, these parties consist of family members or friends whose participation in the business is their principal source of employment and income. The existence of these family or other bonds may intensify conflicts and misunderstandings between the parties and lead to the deterioration of the company. 2 F. Hodge O'Neal & Robert B. Thompson, *O'Neal's Close Corporations* § 8.13 at 67 (Callaghan & Co., 3rd ed. 1994). "[M]any participants in closely held corporations are 'little people,' unsophisticated in business and financial matters." F. Hodge O'Neal, *Close Corporations: Existing Legislation and Recommended Reform*, 33 *Bus.Law.* 873, 884 (1978). "As minority participants in a close corporation may not anticipate dissension or oppression, and indeed may be unaware of their vulnerability, they frequently fail to bargain for adequate protection against mistreatment." *Id.* at 881.

Because majority shareholders have the power to dictate to the minority the manner in which the corporation is run, a minority shareholder in a close corporation becomes vulnerable when dissension develops. *Bostock v. High Tech Elevator Indus.*, 260 *N.J.Super.* 432, 443–44, 616 *A.*2d 1314 (App.Div.1992). The controlling shareholders' voting power enables them to freeze-out minority shareholders by terminating their employment, excluding them from participation in management decision-making, and reducing their salary and other income. *Meiselman v. Meiselman*, 309 *N.C.* 279, 307 *S.E.*2d 551, 558 (1983).

The vulnerability of minority shareholders is exacerbated by the illiquidity of their financial stake in the company. They cannot dissolve the company at will like members of a partnership, nor can they sell their shares on the open market like shareholders in a publicly held corporation. *Ibid.* As a consequence, a shareholder challenging the majority in a close corporation is on the horns of a dilemma. The shareholder can neither profitably leave nor

safely stay with the corporation. In reality, the only prospective buyer turns out to be the majority shareholder. *Brenner, supra,* 134 *N.J.* at 505, 634 *A.*2d 1019 (quoting *Orchard v. Covelli,* 590 *F.Supp.* 1548, 1557 (W.D.Pa.1984), *aff'd,* 802 *F.*2d 448 (3d Cir. 1986)). This inability of minority shareholders to withdraw from the venture on their own terms makes it easy for controlling shareholders to exploit minority shareholders and defeat their reasonable expectations.

Traditionally, American courts were reluctant to interfere in the internal affairs of a corporation. *Meiselman, supra,* 307 *S.E.*2d at 559 (quoting F. O'Neal, *Oppression of Minority Shareholders* § 9.04, at 582 (1975)). However, "[t]he two principal conceptual barriers to the court granting relief to aggrieved minority shareholders—the principle of majority rule in corporate management and the business judgment rule—actually have only limited validity in small business corporations." O'Neal, *supra,* 33 *Bus.Law.* at 884.

Some courts, like the Supreme Judicial Court of Massachusetts, did recognize that shareholders' interests are different in close corporations, and stated that those shareholders are subject to a higher standard of duty than shareholders and directors of publicly held corporations. In *Donahue v. Rodd Electrotype Co.,* 367 *Mass.* 578, 328 *N.E.*2d 505 (1975), the Massachusetts court held that "stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another." *Id.* at 515 (footnote omitted). This heightened duty, which the court labelled one of "utmost good faith and loyalty," was described by then Chief Judge Cardozo of the New York Court of Appeals in *Meinhard v. Salmon:* "Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties." *Meinhard v. Salmon,* 249 N.Y. 458, 164 *N.E.* 545, 546 (1928), *quoted in Donahue, supra,* 328 *N.E.*2d at 516.

Historically, state corporation statutes had provided minority shareholders with little protection against exploitation by controlling shareholders. As Professor O'Neal explained, "Corporation legislation, although designed primarily to meet problems of public-issue corporations, nevertheless applied indiscriminately to all corporations; the statutes did not differentiate between public-issue corporations and close corporations." O'Neal, *supra,* 33 *Bus.Law.* at 873.

Thus for years there was little or no protection that a court could afford oppressed minority shareholders. In *Brenner v. Berkowitz,* Justice Garibaldi furnished an historical overview of the New Jersey Legislature's approach to protecting minority shareholders. She noted that it was not until 1973 that the legislature amended section 14A:12–7 of the Corporation Business Act to provide a specific cause of action to protect minority interests. The present language in 14A:12–7(1)(c) was added by L.1973, c. 366, § 67, effective May 1, 1974. It provides:

(1) The Superior Court, in an action under this section, may appoint a custodian, appoint a provisional director, order a sale of the corporation's stock as provided below, or enter a judgment dissolving the corporation, upon proof that

\*        \*        \*        \*        \*        \*        \*        \*

(c) In the case of a corporation having 25 or less shareholders, the directors or those in control have acted fraudulently or illegally, mismanaged the corporation, or abused their authority as officers or directors or have acted oppressively or unfairly toward one or more minority shareholders in their capacities as shareholders, directors, officers, or employees.

The legislature intended to expand the protection available to minority shareholders "who are powerless within a corporation, as well as powerless to leave." *Brenner, supra,* 134 *N.J.* at 506, 634 *A.*2d 1019 (citing *N.J.S.A.* 14A:12–7 (West 1968) Comment on 1972 Amendments).

The first New Jersey case to construe section 14A:12–7(1)(c) was *Exadaktilos v. Cinnaminson Realty Co.,* 167 *N.J.Super.* 141, 400 *A.*2d 554 (Law Div.1979), *aff'd o.b.,* 173 *N.J.Super.* 559, 414 *A.*2d 994 (App.Div.), *certif. denied,* 85 *N.J.* 112, 425 *A.*2d 273 (1980). The court examined the various techniques that control-

ling members of a close corporation could use to freeze out minority shareholders. *Id.* at 153, 400 *A.*2d 554. It noted that section 14A:12–7(1)(c) had been enacted in response to the failure of traditional principles of corporate law, such as the business judgment rule, to curb these abuses. *Id.* at 154, 400 *A.*2d 554.

In determining whether a particular course of conduct has oppressed a minority shareholder in violation of the new provision, courts should examine the understanding of the parties concerning their roles in corporate affairs.

> The special circumstances, arrangements and personal relationships that frequently underlie the formation of close corporations generate certain expectations among the shareholders ... [that] preclude the drawing of any conclusions about the impact of a particular course of corporate conduct on a shareholder without taking into consideration the role that he is expected to play. Accordingly, a court must determine initially the understanding of the parties in this regard. Armed with this information, the court can then decide whether the controlling shareholders have acted in a fashion that is contrary to this understanding or in the language of the statute, "have acted oppressively * * * toward one or more minority share-holders."

> [*Id.* at 154–55, 400 *A.*2d 554.]

In this Court's most recent application of section 14A:12–7(1)(c), we defined oppressive conduct to include that which frustrates the reasonable expectations of the minority shareholder. *Brenner, supra,* 134 *N.J.* at 506, 634 *A.*2d 1019 (citing 2 F. Hodge O'Neal & Robert B. Thompson, *O'Neal's Close Corporations* § 9.29 at 132 (Callaghan & Co., 3rd ed. 1988)). This approach takes into account the fact that shareholders in close corporations may have expectations that differ substantially from those of shareholders in public corporations. It also requires courts to be flexible in their treatment of section 14A:12–7(1)(c) cases because of the fact-sensitive nature of their inquiry. *Brenner, supra,* 134 *N.J.* at 516, 634 *A.*2d 1019.

We agree with the emphasis in the Appellate Division's opinion that minority shareholders' expectations must, however, be balanced against the corporation's ability to exercise its business judgment and run its business efficiently. *Id.* at 517, 634 *A.*2d

1019. Thus, courts should always be wary of interfering in the internal affairs of a corporation. As we stated in *Brenner:*

> The limited bases for statutory relief * * * reflect an awareness that minority shareholders know the limitations of their power at the time they make their investment in a close corporation. Mere disagreement or discord between the shareholders is not sufficient for a violation of the close corporation statutory provision.
>
> [*Id.* at 506, 634 *A.*2d 1019.]

With these principles in mind, we turn to the facts of the case to determine whether the conduct of Muellenberg and Passerini reflects more than a disagreement or discord among shareholders, but rather amounted to the oppression of Burg within the meaning of section 14A:12–7(1)(c).

## III

To repeat, *N.J.S.A.* 14A:12–7(1)(c) allows a court to grant relief when controlling shareholders "have acted fraudulently or illegally, mismanaged the corporation, or abused their authority as officers or directors or have acted oppressively or unfairly" toward a minority shareholder. The trial court did not find any fraud or mismanagement on the part of Muellenberg or Passerini. The question is whether their actions were oppressive. Ordinarily, oppression by shareholders is clearly shown when they have awarded themselves excessive compensation, furnished inadequate dividends, or misapplied and wasted corporate funds. *Giannotti v. Hamway,* 239 *Va.* 14, 387 *S.E.*2d 725 (1990). This did not occur here.

The remaining measure of oppression in the small corporation is whether the fair expectations of the parties have been met. When personal relations among the participants in a close corporation break down, the "reasonable expectations" that participants had, for example, the expectation that their employment would be secure or that they would enjoy meaningful participation in the management of the business, become difficult, if not impossible, to fulfill. *Meiselman, supra,* 307 *S.E.*2d 551. A person who buys a minority interest in a close corporation does so, not only in the

hope of enjoying an increase in the value of the shareholder's stake in the business, but for the assurance of employment in the business in a managerial position. In addition to the security of long-term employment and the prospect of financial return in the form of salary, the expectation includes a voice in the operation and management of the business and the formulation of its plans for future development. *Ingle v. Glamore Motor Sales*, 73 *N.Y.*2d 183, 538 *N.Y.S.*2d 771, 779–80, 535 *N.E.*2d 1311, 1319 (1989) (Hancock, J., dissenting). In this case, it is reasonable to conclude that Burg's fair expectations were that should he give up his prior employment with a competitor company and enter this small corporation, he would enjoy an important position in the management affairs of the corporation.

It is a close question whether the actions taken by Muellenberg and Passerini at the January 20, 1993, meeting amounted to oppression, as Burg contends. Muellenberg and Passerini claim that their declaration of the first dividend in company history was "fair and reasonable" in light of the company's favorable financial position at that time. They dispute the trial court's conclusion that the dividend would deprive Burg of the needed cash to operate BNJ, asserting that sufficient assets were still available to run the company. Muellenberg also maintains that Burg could not have reasonably expected that he would have exclusive authority and control over the business when BNJ's by-laws named Muellenberg president and chief executive officer.

We agree that it cannot be considered oppression when controlling shareholders seek to rein in management and control the affairs of their corporation. But the expectations of Muellenberg and Passerini that they might exercise majority power conflicted with the expectations of Burg, and were confined by their fiduciary duties to their co-venturer. *Bostock, supra*, 260 *N.J.Super.* at 444, 616 *A.*2d 1314. The equities were close. Burg had devoted the most productive years of his life to building up the company. Due in large measure to Burg's efforts, North American sales of Bikon products rose to over $2,000,000 per year. He could not

reasonably have expected that after ten years as general manager he would be frozen out of the business. On the other hand, Muellenberg could not reasonably have expected that he, the founder of the enterprise, and Passerini would be ignored in the conduct of the company's affairs.

In other circumstances, the solution proposed by the Appellate Division might have resolved the impasse. Burg could have learned to manage the business more as a partner than as a sole proprietor. But the events that followed the Appellate Division's decision have confirmed that the trial court, which could assess the demeanor and relationship of the witnesses, had a better sense of the internal dynamics among the shareholders and could foreshadow Burg's inevitable ouster from Bikon's picture. That ouster would not have been a fair accommodation of the reasonable expectations of all shareholders.

■ The remaining issue was whether Burg or Muellenberg and Passerini should survive with BNJ. In 1988, the Legislature amended *N.J.S.A.* 14A:12–7(8) to permit minority shareholders to petition a court to order a buy-out of the majority. As amended, section 14A:12–7(8) provides that if there is a triggering event,

*[u]pon motion of* the corporation or *any shareholder* who is a party to the proceeding, the court may order the sale of all shares of the corporation's stock held by any other shareholder who is a party to the proceeding to either the corporation or the moving shareholder or shareholders, whichever is specified in the motion, if the court determines in its discretion that such an order would be fair and equitable to all parties under all of the circumstances of the case. (emphasis added).

The statute thus plainly allows the minority to seek a court order for the sale of the stock of "any other shareholder." In most situations, oppressed minority shareholders will lack the resources to buy out the interests of controlling shareholders. As a result, claims of oppression are typically remedied by arranging for the corporation or the majority shareholders to buy out the interests of the minority shareholder. In this case, the record contained the following evidence in support of Burg: Burg was willing and able to purchase the shares of Muellenberg and

Passerini; Burg, who owns the land on which BNJ's offices are located, was most active in operating the company since its inception; Burg is the only shareholder who works full-time for BNJ and the company has been his only source of income for over ten years; Burg was primarily responsible for developing the company's contacts in the United States and Canada and is best situated to maintain the existing operation; and finally, it was Burg who sought to preserve the corporation at a time when Muellenberg and Passerini attempted to dissolve it. *See Musto v. Vidas,* 281 *N.J.Super.* 548, 658 *A.*2d 1305 (App.Div.1995) (reversing minority buy-out of the majority when minority shareholder had not been actively involved in the operation of the company for seven years).

On the other hand, without Muellenberg there would have been no business to divide since he had furnished all the start-up capital and was the inventor of the special design features that propelled the company's sales. Much of BNJ's good will may have derived from the use of the Bikon name. It is, however, too close a call to say that the Chancery Court erred in finding a slight edge in favor of Burg as the surviving shareholder.

Thus, while a minority buy-out of the majority is an uncommon remedy, it was the appropriate one here. The trial court acted within its discretion in ordering Muellenberg and Adda to sell their shares in BNJ to Burg. This remedy is authorized by *N.J.S.A.* 14A:12–7(8) and is consistent with decisions holding that courts are not limited to statutory remedies, but have a wide variety of equitable remedies also available to them. *Brenner, supra,* 134 *N.J.* at 516, 634 *A.*2d 1019; *Walensky v. Jonathan Royce Int'l,* 264 *N.J.Super.* 276, 279, 624 *A.*2d 613 (App.Div.), *certif. denied,* 134 *N.J.* 480, 634 *A.*2d 527 (1993).

Any doubt as to which shareholder should be permitted to invoke the buy-out remedy has been largely dissipated by circumstances. Without resolving the factual disputes set forth in the motions to supplement the record, it appears that since we stayed the Appellate Division's decision, Muellenberg has demonstrated

an ability to market his products in the United States without Burg. Muellenberg, on behalf of his solely owned company BTG, made arrangements with a company called North American, Inc. for it to market products under the "Bikon" name that may compete with B–Loc. North American began soliciting B–Loc's customers, advising them that it had been granted the exclusive license to manufacture and distribute "Bikon" locking devices in the United States, Canada and Mexico. In addition, its sales catalogue is similar to the catalogue BNJ used previously. Oral argument convinces us that there is nothing to stand in the way of Muellenberg and Passerini continuing in the American market without real detriment to their reasonable expectations in forming BNJ. The trial court's solution is thus "fair and equitable to all parties" as required by *N.J.S.A.* 14A:12-7(8).

As it stands, BNJ (now B–Loc) no longer can use the "Bikon" trade name. That license was terminated by BTG prior to the commencement of this litigation. The good will and trade name of Bikon inures to Muellenberg's new venture, which may engage in the sale of Bikon fasteners in the domestic U.S. market. Now that the patent has expired on the only Bikon product to generate significant sales in this country, B–Loc and North American are able to compete freely with each other. Realistically, all that plaintiffs Muellenberg and Passerini might reasonably require to advance their undertaking would be the customer lists generated during the period of their joint enterprise with Burg. If those lists are not available to them now, a customer list as of the date of the buy-out should be furnished by Burg.

Accordingly, we reverse the judgment of the Appellate Division and reinstate the judgment of the Chancery Division. We leave to that court the resolution of any unresolved issues attendant to the buy-out.

*For Reversal and Reinstatement* —Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed* —None.