692 A.2d 119

GERALD BONAVITA, PLAINTIFF, v. ALAN CORBO AND
CORBO JEWELERS, INC., DEFENDANTS.

Superior Court of New Jersey
Chancery Division
Bergen County

Decided November 22, 1996.

*David B. Wasserman,* for plaintiff (*Wasserman & Schachman* ).

*William B. McGuire,* for defendants (*Tomkins, McGuire and Wachenfeld* ).

LESEMANN, J.S.C.

Gerald Bonavita, the holder of one-half the stock of Corbo Jewelers, Inc., instituted this suit claiming that the corporation was deadlocked and that he was the victim of oppression by Alan Corbo, holder of the other 50% of the corporation's stock, who is also its president and chief executive officer. He sought relief under *N.J.S.A.* 14A:12–7 and also under this court's common-law power to remedy such oppression. *See Brenner v. Berkowitz,* 134 *N.J.* 488, 634 *A.*2d 1019 (1993). Gerald Bonavita died before trial, and the suit has been continued by his executrix and widow, Julia Bonavita.

The oppression claim is based on Alan Corbo's rejection of plaintiff's attempt to have the corporation either pay dividends or buy out the Bonavita stock interests.[1] With both demands rejected, plaintiff claims she is locked into a corporation which provides her with no benefit of any kind. At the same time, she says, Alan Corbo and his three sons are employed full time by the corporation, and his wife and daughter are employed part time. Thus,

---

[1] Because the interests of Gerald Bonavita and his estate are essentially the same, references herein will frequently be to "the Bonavita interests" or "plaintiff," which are intended to encompass both Gerald and Julia Bonavita.

the Corbo half of the stock ownership receives substantial benefits—with fringe benefits, the total annual family compensation is between $300,000 and $400,000—while the Bonavita half receives nothing.[2]

Defendants deny any obligation to buy the Bonavita stock. They also maintain that the refusal to pay dividends is merely an application of the "business judgment rule" and is amply justified by sound business reasons. There is no evidence that defendant's "no-dividend" policy is motivated by animus toward plaintiff, or by anything other than their view of what is best for the corporation. Thus, the case presents the question of the extent to which the business judgment rule will insulate a corporation's power structure from a claim of oppression when application of that rule has the effect of providing substantial benefits to some of the holders of the corporation's stock and no benefits to the others.

## A. FACTS

### 1. Evolution of the corporation.

Corbo Jewelers, Inc., (Corbo or the corporation) was organized in 1946 by Michael and Dominic Corbo, and Gerald Bonavita.[3] It began with one store in Bloomfield, New Jersey, gradually expanded to twelve stores, but later retrenched to its present seven locations.

Over the years, as the three incorporators aged, the stockholdings evolved as well. Michael Corbo, who held 50% of the original stock (with Dominic Corbo and Bonavita each holding 25%) was replaced by his three sons, Alan, Michael Jr., and Anthony. They later had difficulties among themselves, and Michael Jr. and Anthony left in 1978, with Alan Corbo ultimately succeeding to

---

[2] Gerald Bonavita was employed by the corporation and earned the same salary as Alan until his death. No payments of any kind have been made to his estate or to Julia since his death.

[3] Gerald Bonavita's wife, Julia, is a sister of Dominic and Michael Corbo.

ownership of one third of the corporation's stock. In 1978, Alan was elected president, and he, Dominic Corbo, and Gerald Bonavita then continued as equal one-third shareholders until Dominic Corbo retired in 1984. At that time, the corporation purchased Dominic's stock for $1,000,000, to be paid in annual $50,000 installments of over twenty years, without interest. Undisputed testimony was that the price and payment terms were fixed by amicable, "family" discussions based on Dominic's anticipated needs during his retirement. From that time on, Alan Corbo and Gerald Bonavita each owned 50% of the outstanding stock of the corporation.

Over the years, Alan's four children also began working in the business.

Stephen began in 1978 and has become the corporation's chief administrative officer, second in command only to his father. Alan, Jr., began in or around 1979 and functions as diamond buyer. Michael has been with the corporation since 1976. He handles jewelry repairs and special orders. Alan's daughter, Cathy Giamboi, works part time in the Corbo store in Yonkers, New York, and his wife, Stephanie, also works part time. Alan earns $57,000 per year; his three sons each earn $52,000; Cathy earns between $20,000 and $30,000 and Stephanie's earnings are apparently in the same range as Cathy's.

Until his death in late 1994, Gerald Bonavita received the same salary as Alan, even after he virtually stopped working in 1991. Upon Gerald's death, however, Alan advised his widow that the Internal Revenue Service would not approve "salary" deductions for any further such payments and thus they could not be continued. They did, in fact, cease very soon after Gerald's death.

Although Gerald Bonavita and Alan Corbo received the same salary while Bonavita was alive, they played distinctly different corporate roles. Alan filled the role of president and chief executive officer, in fact as well as title. With his son, Stephen, he ran the corporation.

Bonavita played a much more retiring role. Essentially, he ran the Bloomfield store, which was characterized at trial as a "Mom and Pop" operation. He took little, if any, role in overall corporate management, and his wife was more active and had greater knowledge about such matters than he did.

In the mid 1980's, as Gerald Bonavita aged and his health deteriorated, he told Alan Corbo that he wanted to retire and wanted to have the corporation (or Alan) purchase his stock. Some discussions ensued, but the parties did not reach agreement on a buy out. Gradually, Bonavita reduced the time he was spending on corporate business, until he completely retired in March 1991. Julia continued working for a short time thereafter, until she too ceased all work in January 1992.

### 2. *Corporate meetings and elections.*

As is the case with many closed corporations, so long as the shareholders were in harmony, Corbo conducted its corporate affairs informally and on a family-like basis. Thus, Alan was elected President in 1978, and so far as appears, he served in that position from then on with no formal reelection.

Similarly, although the certificate of incorporation always called for three directors, the corporation has functioned with just two—Bonavita and Alan Corbo—since 1984. In October 1991, the shareholders amended the corporate by-laws to reduce the number of directors from three to two. However, they did not also amend the certificate of incorporation, which expressly provided that in the event of an inconsistency between it and the by-laws, the certificate would govern.

Other shareholder or director resolutions were drawn and signed as necessary, and corporate meetings also took place on an "as-needed" basis. There were no meetings at all through 1987, 1988, or 1989. In 1992, after this suit was started, there was a vote for directors and Bonavita and Alan Corbo each voted for himself. Thus, presumably, each was elected and continued to

serve as a director. There is no indication of any vote for directors in 1993 or 1994.

### 3. Plaintiff's complaint; the appointment of a provisional director; and the demand for payment of a dividend.

Plaintiff's complaint was filed in December 1991. It alleges a deadlock within the meaning of *N.J.S.A.* 14A:12–7 and also alleges stockholder "oppression" within the meaning of that statute. Plaintiff sought interim relief, and the court, pursuant to Subsection (1) of *N.J.S.A.* 14A:12–7 appointed Thomas Herten, Esq., as a "provisional director" to function while the litigation proceeded.

In early 1994, Bonavita formally requested the corporation to pay a dividend of approximately $650,000 to each of the two shareholders—a total of $1,300,000. That sum represented a portion of the corporation's retained earnings on which income tax had already been paid—a point discussed further below. The request was denied, with Alan Corbo opposed to the request and the provisional director declining to join Bonavita in what he regarded as a matter of "business judgment." An attempt to have the court overrule that decision while the suit was pending was unsuccessful and thus no dividend was paid. Bonavita thereafter modified his request to propose a smaller dividend, but that, too, was denied, and Alan Corbo has remained, ever since, adamantly opposed to the payment of any substantial dividend.

## B. THE CLAIM OF DEADLOCK

Although plaintiff claims there is a corporate "deadlock," that charge is not sharply drawn, and it is not clear just what constitutes the alleged deadlock of which plaintiff complains.

*N.J.S.A.* 14A:12–7 contains two deadlock provisions. Subsection (1)(a) provides that the court may take remedial action upon proof that:

[t]he shareholders of the corporation are so divided in voting power that, for a period which includes the time when two consecutive annual meetings were or should have been held, they have failed to elect successors to directors whose terms

have expired or would have expired upon the election and qualification of their successors.

As noted above, the Corbo certificate of incorporation requires three directors. A by-law provision of questionable validity provides for two directors and, in fact, the corporation has functioned for many years with just two directors.

Plaintiff seems to claim that three directors are required; that the by-law amendment providing for a two-member board is invalid; and that the failure to select a three-member board evidences deadlock. The claim is not persuasive.

First, Gerald Bonavita had long acquiesced in a board composed of two directors and had voted to amend the by-laws to authorize such a board. An attempt to change that position now would raise substantial issues of waiver and estoppel.

■ Further, even assuming a requirement for three directors, there is no demonstration that the two shareholders could not agree on some neutral third party for the additional director's position. There is no proof of any such attempt, no proof of any meeting at which such an election was attempted or such a compromise proposed or defeated. Plaintiff seems to assume that because he and Alan Corbo have different positions on major issues, a deadlock concerning election of directors is inevitable. In fact, however, that is neither an inevitable conclusion nor has it been proven to be a fact.

■ The second statutory deadlock provision is set out in subparagraph (1)(b) of *N.J.S.A.* 14A:12–7. It states that a court may order appropriate relief if a corporation's directors

are unable to effect action on one or more substantial matters respecting the management of the corporation's affairs.

Plaintiff claims that the rejection of her demand for payment of a dividend or a buy-out of the Bonavita stock constitutes such an inability to effect corporate action. However, rather than characterizing the refusal to accede to her demands as an inability "to effect action," it is more accurate to describe those decisions as

what they really are: determinations by defendants to reject plaintiff's demands.

In short, this is not a case where a corporation is unable to act. It can act. And it did act. It acted by denying plaintiff's demands. And it is the result of that action—not an inability to act—which is the basis for plaintiff's claim that she has been left in a hopeless, "no-win" situation. Whether those actions, leading to those results, constitute shareholder oppression is the significant issue presented.

## C. *PLAINTIFF'S CLAIM OF OPPRESSION*

### 1. *Plaintiff's status as a "minority shareholder."*

*N.J.S.A.* 14A:12–7(1)(c) provides that in a corporation having twenty-five or less shareholders, a court may take remedial action (discussed further below) upon proof that

> the directors or those in control have ... mismanaged the corporation, or abused their authority as officers or directors or have acted oppressively or unfairly toward one or more minority shareholders in their capacities as shareholders, directors, officers, or employees.

Since the statute refers to actions aimed at "minority shareholders," and plaintiff owns 50% of the corporation's stock, an initial question is whether she can be considered a "minority shareholder" within the meaning of the statute. Consideration of the policy underlying the statute, however, makes clear that the answer to that question is "yes." If the statute is otherwise applicable, it is not rendered inapplicable simply because plaintiff owns 50% of the Corbo stock rather than, hypothetically, 40% or 49%. Indeed, while defendants deny any oppressive or wrongful conduct, they do not claim that the statute is inapplicable simply because plaintiff owns one half of the corporation's stock rather than a numerical minority. Clearly, such a distinction would make no sense and would be inconsistent with what *N.J.S.A.* 14A:12–7 is designed to accomplish.

The thrust of Subsection (1)(c) of the statute is protection from the abusive exercise of *power.* That is clear from the broad

language referring to wrongful acts by either directors or "those in control" of the corporation, and the further reference to abuse of authority by "officers or directors." Thus, the label worn by those accused of oppression—whether stockholders, directors, or officers—is not critical. The question is whether they have the power to work their will on others—and whether they have done so improperly.

So too, in determining whether a particular shareholder can exercise statutory rights granted to "minority" shareholders, the focus must be on that shareholder's power—or the lack thereof. As the court found in *Berger v. Berger,* 249 *N.J.Super.* 305, 315, 592 *A.*2d 321 (Ch.Div.1991), the question of whether one is a minority shareholder should not

> be determined through a mechanistic count of stock ownership percentages ... [but rather] by a qualitative evaluation of the actual control a particular shareholder may exert on a closely held corporation.

In *Berger,* the plaintiff held 98% of the corporation's outstanding stock. Voting rights pertaining to those shares, however, were held in a trust controlled by the defendant, and thus plaintiff had little if any effective power. Under those circumstances, and in view of the policy underlying the statute—to "prevent abuse and oppression by those in control of a closely-held corporation upon those with inferior interests"—the court found that plaintiff did qualify as a "minority shareholder" within the meaning of *N.J.S.A.* 14A:12–7.

The reasoning in *Berger* is persuasive. It accords with the policy of the statute and applies its provisions realistically rather than artificially. It focuses on relative power and the ability of one side to oppress another, rather than on numbers or percentages of stock ownership which, in a given case, may be an insignificant factor.

■ Here, power rests with defendants, and they have the ability to exert that power on plaintiff because plaintiff cannot generate a majority vote on the board of directors. In addition, she is faced with Alan Corbo's holding the position of president

and chief executive officer. Under those circumstances, consistent with the policy of the statute and the sound holding of *Berger v. Berger,* it is clear that if the oppression provisions of *N.J.S.A.* 14A:12–7(1)(c) are otherwise applicable, they are not rendered inapplicable merely because plaintiff owns 50% of the stock of Corbo Jewelers, Inc.

2. *Defendant's refusal to pay dividends; the financial condition of the corporation; and defendant's exercise of "business judgment."*

The essence of plaintiff's claim is that the corporation, as operated by defendant Alan Corbo, provides substantial benefits for Alan Corbo and his family but no benefits for Bonavita. That is certainly an accurate statement.

As noted, the six Corbo family members on the corporate payroll realize approximately $400,000 per year in salary and other benefits. And while there is no claim that the salaries are excessive, neither was there a showing that if the "inside" employment were terminated those family members could earn as much elsewhere. In addition, of course, a job in the family business probably provides considerably more security than one might find in other employment.

It is also clear that Alan Corbo recognized that such continued employment was indeed a substantial benefit. When Gerald Bonavita presented what he claimed was a chance to sell the entire business for a handsome price, Alan Corbo responded by insisting that an essential condition of any such sale must be the ability of his three sons and himself to continue their employment with the new corporate owner.[4]

---

[4] Plaintiff never produced any details of this alleged sale, and it is not mentioned here as having any significance other than what it revealed as to Alan Corbo's insistence upon continued employment for his family.

Such employment is, of course, a frequent and perfectly proper benefit of stockholders in a closed corporation. *See, e.g., Brenner v. Berkowitz*, 134 *N.J.* 488, 509, 634 *A.*2d 1019 (1993); *Exadaktilos v. Cinnaminson Realty Co., Inc.*, 167 *N.J.Super.* 141, 154, 400 *A.*2d 554 (Law Div.1979), *aff'd*, 173 *N.J.Super.* 559, 414 *A.*2d 994 (App.Div.), *certif. denied*, 85 *N.J.* 112, 425 *A.*2d 273 (1980). The difficulty here is that the benefit flows in one direction only: to the Corbos, and not to Bonavita, and there is no compensating, alternative benefit for the Bonavita interests.

Mrs. Bonavita testified that she and her husband had no children who could move into the jewelry stores' operation. She also said, as did her husband in his *de bene esse* deposition before trial, that Mr. Bonavita had hoped to receive some benefits from the corporation before he died, and she has a similar hope now for herself. Otherwise, as she put it, her husband's interest, which she now owns, will be locked forever within Corbo Jewelers, Inc., and will be of absolutely no benefit to her, as it was of no benefit to her husband.

Absent employment, and absent any thought of long-term growth (inapplicable to Julia Bonavita as it was to Gerald Bonavita because of age), the normal corporate benefit which one in the position of Mr. or Mrs. Bonavita might expect would be the payment of dividends. This corporation, however, pays no dividends.

Plaintiff's unsuccessful attempt to have the corporation pay a dividend is noted above. It is not disputed, nor is plaintiffs' claim that the size of the requested dividend is immaterial. Defendants have made clear that *no dividend* of any significant size will be approved. Indeed, the last payment of any dividend was $110,000 to each of the two stockholders in 1988, apparently related to Alan Corbo's need for $96,000 to pay a debt he incurred when he purchased six shares of stock following the buy out of his two

brothers. There is no indication of when, if ever, a dividend was paid before 1988.[5]

Plaintiff argues that Alan Corbo's "no dividend" policy is particularly harsh in view of the extraordinary financial condition of the corporation. That argument has considerable merit.

As of June 30, 1993,[6] the corporate balance sheet showed retained earnings of more than $5,000,000 and, after adjustment for treasury stock held as a liability, showed total stockholders' equity of approximately $4,600,000. Within that $4,600,000 was the so-called AAA account, which totaled $1,390,000, and represented funds on which income tax had already been paid. That is the sum which plaintiff wanted distributed as dividends, and its origin and status requires a brief explanation:

Corbo is a "Subchapter S" corporation under the Internal Revenue Code. That means that each year its net profits are taxable directly to the individual shareholders in proportion to their stock interests—in this case, one-half to Alan Corbo and one-half to Bonavita. To meet that tax liability, the parties followed a practice of having the corporation disburse to each of the stockholders, as dividends, enough money to pay the taxes for which they became liable. The remainder of the corporate profits, on which taxes had therefore been paid, then became part of retained earnings. The sum of those after-tax profits, accumulated over a number of years, was designated as the corporate AAA account which, as noted, totaled some $1,390,000.

In addition, on June 30, 1993, the corporation had cash, or liquid assets easily convertible into cash, of approximately $1,100,000 and

---

[5] An exception to this statement concerns the annual (or almost annual) dividends paid for the purpose of enabling the stockholders to pay taxes charged to them respecting profits earned by the corporation—a point discussed below.

[6] All parties used June 30, 1993 as the applicable date for valuation of the corporation.

current liabilities of only $12,000.[7]  It also owned a building in Rutherford with an appraised value of $525,000, free of any mortgage and—plaintiff argues—available as a source of additional funds through mortgage financing.

Defendants' stated reason for the refusal to pay dividends is the corporation's need for cash.  Alan Corbo testified that the business is seasonal and that the corporation's continued profitability requires it to have substantial cash available to buy quickly when "bargains" become available.  The ability to do that, without the need to borrow money and pay interest, he maintained, is one reason for the corporation's success over the years.

Alan Corbo also pointed to the anticipated need for substantial renovation expenses for two of the corporation's stores which were approaching the end of leaseholds.  In each case, he said, the landlord would require such expenditures as a condition to lease renewal.

Further, defendants contend that shortly before Bonavita had requested payment of dividends, the corporation had lost the bank line of credit which, for many years, had provided available credit of $3,000,000.  The bank had recently reduced the line to $1,500,-000 and thereafter eliminated it entirely.  That change, Corbo argued, left the corporation in a vulnerable position.[8]

---

[7] These numbers do not include the excess of accounts receivable ($640,000) over accounts payable ($390,000).  Nor do they include inventory.

[8] On further examination, the loss of the line of credit turned out to be something less dire than originally depicted.  The bank had initially reduced the line from $3,000,000 to $1,500,000 because the corporation had seldom used it and its borrowings rarely, if ever, exceeded $500,000.

The cause of the final termination is not clear and no one from the bank testified.  It may have been precipitated by this litigation, by the corporation's poor performance in recent years, or perhaps by a bit of both.  It does seem that the line of credit could have been continued if Alan Corbo and Gerald Bonavita had personally guaranteed it—something Alan Corbo was not willing to do and on which Gerald Bonavita's position was not clear.

While the facts just described strongly indicate that the corporation can well afford to pay dividends, a contrary decision could hardly be called irrational. Indeed, from Alan Corbo's point of view, the "no dividend" policy undoubtedly makes good sense. Since the primary benefit that he receives from the corporation is continued employment for himself and his family, the maintenance of a $5,000,000 earned surplus, large cash balances, and the non-payment of dividends is certainly in his best interest.

If the Corbo's and Bonavita were in essentially the same position, and each was similarly affected by the decision against paying dividends, that policy could hardly be characterized as anything other than a permissible exercise of business judgment. It would, presumably, be unassailable under the principle that a court will not normally overturn the exercise of such judgment. *See, e.g., Walker v. Briarwood Condo Ass'n,* 274 *N.J.Super.* 422, 426, 644 *A.*2d 634 (App.Div.1994); *Maul v. Kirkman,* 270 *N.J.Super.* 596, 614, 637 *A.*2d 928 (App.Div.1994).

But that, of course, is not this case. The problem here is that the operation of the corporation benefits only one of its shareholders—Alan Corbo. It provides no benefit of any kind to Julia Bonavita. She receives, and she will receive, no salary. The long range future of the corporation will not benefit her. And the "no dividend" policy is not a short term measure adopted to meet some pressing financial necessity. It is what Alan Corbo sees as the norm, and a policy from which he does not intend to deviate.

What Julia Bonavita has, and what she will continue to have so long as Alan Corbo is able to make the kinds of decisions he has been making, is a block of stock which has absolutely no value. Alan Corbo has made and will continue to make decisions which are in his best interests (and those of his family) and which ignore the wishes, needs, and best interests of his co-shareholder.

Given the effect of those actions on plaintiff, and regardless of whether defendants' actions might otherwise be termed "wrongful" or "illegal," there is no question that defendants' conduct has destroyed any reasonable expectation that plaintiff may have

enjoyed respecting her stock interests. As such, it is clear from the decision of our Supreme Court in *Brenner v. Berkowitz*, 134 *N.J.* 488, 634 *A.*2d 1019 (1993), from other New Jersey case law, from comments and analyses by leading text writers, and from decisions in other states, that defendants' actions do indeed constitute "oppression" within the meaning of *N.J.S.A.* 14A:12–7.

### 3. *The applicable law.*

In *Brenner*, the Court endorsed the concept of testing for oppression by examining the "reasonable expectations" of the complaining minority shareholder and the effect of the defendants' actions on those expectations. Under that approach, the oppression to which a vulnerable minority shareholder may be subjected is not limited to illegal or fraudulent actions. Rather, the test of oppression must focus on the minority's "reasonable expectations" and whether the actions of the defendants have frustrated those expectations. *See Exadaktilos v. Cinnaminson Realty Co.*, 167 *N.J.Super.* 141, 400 *A.*2d 554 (Law Div.1979), *aff'd*, 173 *N.J.Super.* 559, 414 *A.*2d 994 (App.Div.), *certif. denied*, 85 *N.J.* 112, 425 *A.*2d 273 (1980) (cited and discussed with approval in *Brenner*, 134 *N.J.* at 509, 634 *A.*2d 1019). *See also Muellenberg v. Bikon Corp.*, 143 *N.J.* 168, 669 *A.*2d 1382 (1996) (reaffirming and expanding upon many of the themes in *Brenner*, including the focus on the parties' reasonable expectations).

The focus on "reasonable expectations" rather than a search for "wrongful" conduct is consistent with the approach taken today by most courts and commentators. *See, e.g.*, 2 F.H. O'Neal and R. Thompson, *O'Neal's Oppression of Minority Shareholders*, Sec. 7:15, p. 88 (2d ed. 1991)

> One of the most significant trends in the law of shareholder relationships in recent years is the increasing willingness of courts to look to the reasonable expectations of shareholders to determine whether "oppression" or similar grounds exist as a justification for involuntary dissolution or another remedy. . . .
>
> The increasing use of the reasonable expectations standard reflects a move away from an exclusive search for egregious conduct by greater consideration of the position of the complaining shareholder, even if no egregious conduct by the controllers can be shown.

*See also, id.* at Sections 7:12 to 7:16 (noting that most courts in the 37 states that have shareholder oppression statutes have concluded that the test for "oppression" should focus on "reasonable expectations" and that a showing of fraud or mismanagement is not required); *Id.* Section 7:14, at 87 (referring to "no-fault" grounds for relief and to legislatures and courts having "pushed the focus of the ... remedy [for minority shareholders] beyond the fault of the controlling stockholders.").

O'Neal and other writers cite scores of cases applying those principles. *See, e.g., Balvik v. Sylvester,* 411 *N.W.*2d 383 (N.D. 1987); *Stefano v. Coppock,* 705 *P.*2d 443 (Alaska 1985); *Fox v. 7L Bar Ranch Co.,* 198 Mont. 201, 645 *P.*2d 929 (1982); *McCauley v. Tom McCauley & Son,* 104 N.M. 523, 724 *P.*2d 232 (App.1986). Most add little to the analysis summarized above and simply apply those concepts to fact situations which bear little resemblance to the Corbo/Bonavita dispute. One leading New York case, however, does have an analogous fact pattern and is particularly significant.

In *In re Kemp & Beatley, Inc.,* 64 N.Y.2d 63, 484 *N.Y.S.*2d 799, 473 *N.E.*2d 1173 (1984), two minority shareholders retired from their employment with a closed corporation. While they had worked for the corporation, the business had regularly distributed its earnings in proportion to the ownership interests of the different stockholders, even though the payments were sometimes termed "salary." Following the retirement of the plaintiffs (who owned approximately 20% of the corporation's stock) that policy was changed and distributions thereafter were based on alleged contribution of services rather than proportionate stock holdings. On that basis, the plaintiffs received no payments, and, as the court noted, their stock was turned into "a virtually worthless asset." *Id.,* 484 *N.Y.S.*2d at 802, 473 N.E.2d at 1176.

In a challenge to that change in corporate policy, the trial court affirmed the findings of a referee that the plaintiffs had reasonable and legitimate expectations "that they would not be arbitrarily excluded from gaining a return on their investment." The

Court of Appeals affirmed that conclusion and discussed the New York counterpart to *N.J.S.A.* 14A:12–7 in terms comparable to those used by our Supreme Court in *Brenner.* It referred to the "reasonable expectations" of minority shareholders, their vulnerability, the power of the majority, and noted,

> A wielding of this power by any group controlling a corporation may serve to destroy a stockholder's vital interests and expectations.
>
> [*In re Kemp & Beatley, Inc.,* 484 *N.Y.S.*2d at 805, 473 *N.E.*2d at 1179.]

The court also endorsed the concept of analyzing "oppressive conduct" as something "distinct from illegality." Citing, among other cases, *Exadaktilos v. Cinnaminson Realty Co., supra,* it held that analysis should focus on the minority's "reasonable expectation":

> A shareholder who reasonably expected that ownership in the corporation would entitle him or her to a job, a share of corporate earnings, a place in corporate management, or some other form of security, would be oppressed in a very real sense when others in the corporation seek to defeat those expectations and there exists no effective means of salvaging the investment.
>
> [*Ibid.*]

Those expectations, said the court, had been frustrated by the actions of the majority which

> has by its policies effectively rendered plaintiff's shares worthless ... [and has prevented them] from receiving any return on their investments.
>
> [*Id.* at 802, 473 *N.E.*2d at 1176.]

That language aptly describes the actions of defendants here and the effect of those actions on plaintiff.

When defendants terminated the salary payments that had been made to Gerald Bonavita, they had an obligation to provide, or at least try to provide, some alternative benefit to the holder of the Bonavita stock. They were not free simply to ignore those interests and operate the corporation for the sole benefit of Alan Corbo. That course of conduct was consistent with no one's reasonable expectations. Whether we consider the Bonavita expectations to include a buy-out, a distribution of dividends, some form of salary continuation, or some other form of benefit/compensation, one thing is clear: they did not consist of an expectancy that Gerald Bonavita's widow would be locked into a meaningless,

valueless stock ownership, with no expectancy of any relief, no way to receive any benefit, and no way out! As Justice Garibaldi characterized such a position in *Brenner*, she would be "powerless within [the] corporation, as well as powerless to leave [it]." *See* 134 *N.J.* at 506, 634 *A.*2d 1019.

That exercise of power by Alan Corbo is a clear example of the kind of oppression discussed above. While the action may not be "fraudulent" or constitute some other form of "misconduct," no, such finding of "fraud" is necessary in order to qualify it as oppression. *See Brenner*, 134 *N.J.* at 506, 634 *A.*2d 1019; O'Neal & Thompson *supra*, Section 7:14; *In re Kemp & Beatley, Inc.*, 484 *N.Y.S.*2d at 804–05, 473 *N.E.*2d at 1178–79. Rather, it is the "wielding of ... power" in a manner which "destroy[s] a stockholder's vital interest and expectations" that constitutes oppression. And such a wielding of power, with just such a result, is precisely what exists here.

In sum, tested by the standard of *Brenner v. Berkowitz* and the other authorities cited, defendants' conduct constitutes oppression within the meaning of *N.J.S.A.* 14A:12–7. As all of the above authorities make clear, defendants' reliance on the "business judgment rule" cannot change that conclusion. Plaintiff is entitled to an appropriate remedy. The nature of that remedy is the next question to be considered.

### D.  *THE APPROPRIATE REMEDY*

*N.J.S.A.* 14A:12–7 sets out four remedies which a court "may" order to remedy "oppression." A court

> may appoint a custodian, appoint a provisional director, order a sale of the corporation's stock as provided below, or enter a judgment dissolving the corporation....

The statutory power to order a stock sale, as described further in Subsection (8), is a power to order an unwilling party to *sell* stock. It does not authorize a mandatory *purchase* by someone otherwise unwilling to buy.

■ In *Brenner v. Berkowitz, supra*, however, the Court held that the statutory list of remedies was non-exclusive and that the statute "was not intended to supersede the inherent, common law power of the Chancery Division to achieve equity." 134 *N.J.* 488, 512, 634 *A.*2d 1019. Rather, said the Court,

[W]hen a statutory violation occurs, a court retains its discretion to fashion equitable remedies.

[*Id.* at 514, 634 *A.*2d 1019.]

One of those equitable remedies, it held, is the power to order an involuntary *purchase* of stock held by one of the corporation's shareholders:

[A]lthough the statute authorizes only voluntary purchases of stock, we are persuaded that in appropriate circumstances a court exercising its equitable powers, as an alternative to dissolution, could compel the purchase of a shareholder's stock by the corporation; under exceptional circumstances, the court's equitable power might encompass the power to compel an involuntary buy-out by the other shareholders.

[*Id.* at 513, 634 *A.*2d 1019.]

That power, however, should be exercised sparingly:

Because an involuntary purchase of stock is not a statutorily authorized power, its use should be reserved primarily for those instances in which the only practical alternative to an involuntary buy-out would be dissolution.

[*Ibid.*]

Dissolution, of course, is a "last resort" remedy and something which neither defendant nor plaintiff wants here. What plaintiff does want is an order directing the corporation, or Alan Corbo, to purchase the Bonavita stock. That remedy, as noted, is available, but should be imposed only if the court is satisfied that it represents "the only practical alternative" to dissolution and that some lesser remedy will not suffice.

Neither side in this case has focused on any such alternative remedy. The reason for that seems clear: there is no reasonable, practical lesser remedy which will solve the problem inherent in this relationship and provide plaintiff with the long-range relief to which she is entitled. In short, no other remedy will work.

The problems that brought the parties to this suit are inherent in their relationship. That relationship is not something which

this court can alter by an order attempting to modify or control their actions while they remain "married" to each other. The conflict will remain, and its symptoms will reappear in what will inevitably be a continuing war between the two.

Thus, the corporation could certainly be ordered to pay the dividend which plaintiff requests—or at least some smaller dividend, as per the list of thirteen possible "equitable remedies" set out in *Brenner*, and particularly Item (10), which refers to the court's "requiring declaration of a dividend." 134 *N.J.* at 515, 634 *A.*2d 1019.

But if that were done, what about next year? Or the year after? Alan Corbo will continue to see such payments as antithetical to the best interests of the corporation. And as he defines the best interests of the corporation—consistent with his best interests and those of his family—his viewpoint would hardly be irrational. But it will continue to be inconsistent with the reasonable expectations of the Bonavita interests.

Similarly, the court could continue the appointment of the present provisional director or appoint someone else with a direction for that person to participate more actively in the business of the corporation. But given the ongoing divergence between the interests of the two shareholders, no such appointment could "solve" the existing problem. Rather, it would simply continue an obviously unsatisfactory condition in which some third party would make critical decisions for the corporation on a long-term, probably permanent, basis.

And, of course, the differences between the two sides would not manifest themselves only on a single annual question of payment of a dividend. Rather, the continuum of business decisions that arise throughout the year—both large issues and seemingly minor ones—would all be affected by the different approaches of the two sides. Everything from merchandising decisions to capital improvements, opening or closing of stores, and countless subsidiary issues would necessarily be affected by the different philosophies (the different expectations) of the two sides.

In sum, there is no rational basis on which this corporation can continue to exist and operate with half its shares owned by the Corbo interests and half by the Bonavita interests. There must be a "divorce." One method of accomplishing that, raised and explored at trial but shown to be unworkable, would be a division of the corporation's stores between the two shareholders. The difficulty with such a division is that there is nothing that Mrs. Bonavita could do with three or four of the seven Corbo stores. She is not in a position to operate them. And Alan Corbo made emphatically clear that there is today no market for retail jewelry stores. She would not be able to sell them.[9]

That brings us back, then, to plaintiff's request for a compulsory buy out of her stock. And since such a mandatory purchase by the corporation or Alan Corbo represents a less drastic measure than dissolution of the corporation, it is clear that the only feasible, rational remedy here is an order that the corporation (or perhaps Alan Corbo) be required to purchase the Bonavita stock interests.

Based on an analysis and evaluation of the extensive evidence submitted at trial as to the value of the Bonavita stock interests, the court has concluded that the price at which that sale should take place is $1,900,000.[10]

What remains to be resolved, however, are the terms and conditions under which a sale at that price should take place.

-----

[9] A division of the corporation's inventory is also a theoretical possibility but it presents the same insurmountable difficulties as a division of the stores.

[10] In an expanded version of this opinion, delivered to the parties and on file with the case record, the court discussed the valuation theories and expert testimony submitted at trial; the court's appraisal thereof; and the reasoning which led to the conclusion that the "fair value" of the Bonavita stock, for purposes of a compulsory purchase by the corporation or Alan Corbo, is $1,900,000. That discussion is not reproduced here because of its length and also because it contains little of interest to anyone beyond the immediate parties and their attorneys.

At trial, little was said on that issue. In summation, plaintiff presented a scenario as to how the stock could be paid for reasonably promptly, but there was no proof of the feasibility of the proposal and defendants claimed it was totally unrealistic.

In short, although some basic principles are clear, there has not been enough presented for the court, at this point, to fix the details of the sale which is to take place. Thus, the $1,900,000 price is, of course, a "cash price." But a purchase on some other basis may not only be reasonable, but may be imperative. If that is the case, and payment is to be made over time, an interest rate must be fixed, as must a schedule of payments, possible security, and a myriad of other details. None of them can be finalized based on the evidence submitted at trial.

There is also a possible question as to *who* is to purchase the Bonavita stock. The order to be entered at this time will direct that the corporation buy the stock. However, *Brenner v. Berkowitz* indicated that in an appropriate case, where there is a need to do so, a court may order that the purchase be made by another shareholder. So here, while a purchase by the corporation is preferable and will be the first option, it is possible that a purchase by Alan Corbo may require consideration. That too cannot now be resolved.

To investigate and consider all of these issues, and any others that must be resolved in order to effect the purchase of the Bonavita stock, this court will appoint a special fiscal agent. The agent will consult with the attorneys for the parties; make such independent investigation as may be deemed necessary or appropriate; and may consult with banks, other possible lending sources, accountants, and any one else deemed helpful. The agent will then submit a proposal as to the terms and conditions on which the sale will take place. The parties will have an opportunity to be heard concerning the agent's report, and thereafter, the court will enter a final order fixing the terms and conditions of sale.