**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1796-19

GARY MATUSOW, D.O.,

    Plaintiff-Appellant,

v.

JAMES IZANEC, M.D.,

    Defendant,

and

VINCENT MCLAUGHLIN, M.D.,
GASTROENTEROLOGY GROUP
OF SOUTH JERSEY, P.C., THE
ENDOSCOPY CENTER OF
SOUTH JERSEY, P.C.,

    Defendants-Respondents.

_____

MATUSOW OFFICES, LLC,

    Plaintiff,

v.

THE ENDOSCOPY CENTER
OF SOUTH JERSEY, P.C.,

Defendant.

---

MATUSOW OFFICES, LLC,

    Plaintiff,

v.

GASTROENTEROLOGY GROUP
OF SOUTH JERSEY, P.C.,

    Defendant.

---

MATUSOW OFFICES, LLC,

    Plaintiff,

v.

GASTROENTEROLOGY GROUP
OF SOUTH JERSEY, P.C., and
THE ENDOSCOPY CENTER OF
SOUTH JERSEY, P.C.,

    Defendants.

---

Argued May 24, 2021 – Decided August 5, 2021

Before Judges Currier, Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Gloucester County, Docket Nos. C-000054-16, C-000025-17, C-000026-17, C-000042-17, L-0304-17, LT-0370-17, and LT-0371-17.

Thomas J. Hagner argued the cause for appellant (Hagner & Zohlman, LLC, attorneys; Thomas J. Hagner and Thomas A. Hagner, on the briefs).

John F. O'Riordan argued the cause for respondents.

PER CURIAM

This knotty litigation arises out of competing claims by several doctors who once worked together in a gastroenterology practice. The parties alleged claims of shareholder oppression, breach of fiduciary duty, unjust enrichment, and disputes regarding the property that housed the gastroenterology practice and endoscopy center.

Plaintiff Gary Matusow, D.O. appeals from the order for final judgment entered after a bench trial and the order granting defendants counsel fees. We affirm in part and reverse and vacate in part.

I.

Matusow started the Gastroenterology Group of South Jersey, P.C. (Gastro Group) in 1989 and opened The Endoscopy Center of South Jersey, P.C. (Endo Center) several years later.[1] Matusow performed colonoscopies and

---

[1] We refer to the Gastro Group and Endo Center collectively as the practices.

A-1796-19

upper endoscopies at the Endo Center. He stated he grew the practices over time through referrals.

When Matusow started the Endo Center, he had privileges at four local hospitals. By 2009 or 2010, the hospitals had either closed or merged into what became Inspira Hospital in Vineland.

In 2005, the practices moved into a building in Vineland owned by Matusow Offices LLC (LLC). Matusow was the sole owner of the LLC.

Defendant Vincent McLaughlin, M.D. practiced for many years as a gastroenterologist at a surgical and multi-specialty center in Voorhees. Matusow and McLaughlin knew each other, and McLaughlin would sometimes fill in for Matusow in an emergency. In 2004, the doctors discussed McLaughlin joining Matusow's practice, but McLaughlin did not feel it was the right time for him.

In 2009, Matusow and McLaughlin began serious discussions regarding McLaughlin joining the practices. McLaughlin testified he thought "[t]here was a lot of room for growth [and] expansion" in the Vineland area, and he "was confident that [he] could grow [Matusow's] solo practice into something larger, expand it, bring more doctors in, and have a large, successful, thriving practice

4

. . . ." He stated he had discussed his ideas with Matusow and this was their "shared vision . . . ."

According to their accountant, the doctors agreed that Matusow would be president of the practices and primarily responsible for managing them on a day-to-day basis.

McLaughlin began working as an employee of the Gastro Group in January 2010. He explained he "worked without a contract until June of 2010 because [Matusow] was still contemplating and reviewing all of the contents of the contract", but they eventually signed identical employment contracts. Within a year, McLaughlin became a shareholder of the practices. He paid $100,000 for a fifty percent interest in the Endo Center. Because the Gastro Group did not have an independent value, McLaughlin paid $100 for a fifty percent share of that entity. McLaughlin also expected to purchase part of the Vineland building but Matusow refused to sell any portion of the property.

McLaughlin testified that Matusow did not tell him that the Gastro Group and Endo Center had guaranteed a personal loan for Matusow on a shore property and guaranteed the mortgage on the premises. Nor did Matusow inform McLaughlin that he was involved in an ongoing dispute with the hospital in Vineland where he had privileges.

A-1796-19

Matusow was going through protracted divorce proceedings when McLaughlin joined the practices in 2010. In connection with the divorce, a CPA and expert business valuator – Michael Saccomanno – prepared a business valuation of the practices. In the June 2011 report, Saccomanno stated that Matusow brought McLaughlin into the practices, in part, "in an attempt to mitigate potential exposure" to the risk of losing privileges and the consequences that would follow. During the trial, Saccomanno confirmed that McLaughlin was hired "as a loss mitigation measure . . . due to the potential for Dr. Matusow either losing privileges or losing his license . . . ."

During his testimony, Matusow denied that the potential loss of his privileges had any connection to his recruitment of McLaughlin. He stated his dispute with the hospital had "nothing to do with any interest in me needing somebody to join the practice." He said his "need to have somebody else with me was to be able to generate more time for my two kids, because I was totally overwhelmed with work."

Prior to joining Matusow, McLaughlin recruited defendant James Izanec, M.D. to his previous practice. Then in March 2014, Izanec joined the practices, although Matusow would not sign Izanec's employment agreement until

A-1796-19

December 2014.  Effective October 1, 2014, Izanec became an equal one-third partner of the practices.

In addition to owning a one-third share of the practices, all three doctors were on the board of directors and were elected officers – Matusow served as president, McLaughlin as vice-president and secretary, and Izanec was the vice-president and treasurer.  Under the practices' bylaws, the "Duties and Authority of President" were defined:

> The President shall be the chief executive officer of the Corporation.  Subject only to the authority of the Board, he shall have general charge and supervision over, and responsibility for, the business and affairs of the Corporation.  Unless otherwise directed by the Board, all other officers shall be subject to the authority and supervision of the President.  The President may enter into and execute in the name of the corporation contracts or other instruments in the regular course of business or contracts or other instruments not in the regular course of business which are authorized, either generally or specifically, by the Board.  He shall have the general powers and duties of management usually vested in the office of president of a corporation.

After Izanec joined the practices, each doctor had an identical employment agreement with Gastro Group.  The employment agreement stated that the "duties of the Employee shall include, but shall not be limited to, office hours, hospital hours, hospital call, night call, weekend call, and vacation call."

Under paragraph two, the employment agreement could be terminated:

7

(f) by the Employee or the Corporation, without cause, on ninety (90) days advance notice, provided that the Corporation acknowledges that any such election by the Corporation to terminate the Employee's employment hereunder "without cause" must be approved by seventy-five percent (75%) of the stock interest of the shareholders of the Corporation (excluding the vote of the Employee) pursuant to the applicable provisions of the Shareholder's Agreement between the Corporation and its shareholders. The Corporation shall have the option to request the Employee to cease the Employee's professional activities on behalf of the Corporation at any time during the ninety (90) day notice period if the Corporation agrees to pay the Employee until the end of the ninety (90) days' notice, such payments to be reduced by any sums received elsewhere by the Employee for medical services performed by the Employee during that ninety (90) day period; or

(g) by the Corporation, without advance notice, for cause. The Corporation acknowledges that any such election by the Corporation to terminate the Employee's employment hereunder "for cause" must be approved by 75% of the stock interest of the shareholders of the Corporation (excluding the vote of the Employee) pursuant to the applicable provisions of the Shareholder's Agreement between the Corporation and its shareholders. For cause is defined as:

> . . . .

> (vii) in the event the Employee should lose his medical license and privileges either by way of revocation or suspension in the State of New Jersey;

> . . . .

8

(ix) in the event the Employee does not retain staff privileges during the term of this Agreement at Inspira Medical Center Vineland.

During trial, Matusow testified about the issue regarding his hospital privileges. He stated that hospital privileges had to be renewed every two years and the renewal application process was typically "[n]ot too complex." Applicants had to answer some questions and provide the hospital with a copy of his or her medical license and DEA[2] registration. Matusow described the usual renewal process as "pretty much like a rubber stamp."

Lori Garrison was a long-time employee and office manager of the Gastro Group. Her duties included completing and submitting the privilege renewal applications for the doctors. All three doctors were required to renew their privileges in 2015. However, Garrison's submissions were late.

Matusow stated he only learned the renewal applications were submitted late when he was notified his submission was untimely and he would have to reapply for credentialing. The process entailed essentially starting from the beginning as an uncredentialed doctor, including appearing before the hospital's credentials committee. During trial, Matusow blamed the loss of privileges on

---

[2] Drug Enforcement Agency.

A-1796-19

Garrison's tardiness and the hospital seizing an "opportunity . . . to make an issue . . . ."

McLaughlin and Izanec were only sanctioned with late fees for their late applications. Their privileges were otherwise renewed without issue.

McLaughlin testified that Matusow's 2015 privilege renewal application to Inspira was more "involved" than a typical renewal because of his "previous problems with the hospital administration and other issues." For instance, Matusow needed to submit a "log" identifying twenty procedures in which he administered conscious sedation,[3] and he had not performed the required number. McLaughlin stated that Garrison needed legal assistance to complete Matusow's application. And even when Garrison submitted the renewal application two months late, it was still incomplete.

Because Matusow's privilege renewal application was not approved, his privileges at Inspira were set to lapse on July 1, 2015. The hospital denied Matusow's request for interim privileges. McLaughlin said that was a "signal

---

[3] Dr. Adam Elfant, who was qualified at trial as an expert in the field of gastroenterology, testified that "there are different levels of sedation" for endoscopic procedures, including general anesthesia, deep sedation, and conscious sedation, which is "basically sedation provided by a physician" rather than an anesthesiologist.

A-1796-19

that [Matusow] was probably not going to get privileges." The doctors retained counsel to navigate the situation.

McLaughlin described this as "a big issue" for the practices. He explained: "If you don't have a privilege at a local hospital you can't do procedures in an out-patient endoscopy center, which is our endoscopy center." Counsel advised the doctors that Matusow should not perform procedures at the Endo Center until he had hospital privileges somewhere.

McLaughlin testified that he and Izanec tried to work with Matusow and handle his scheduled procedures while Matusow attempted to reapply for privileges. As part of that process, Matusow met with the Inspira Credentialing Committee on July 22, 2015. Matusow's notes from the meeting indicate that he discussed many of the issues he had with doctors, staff, and policy at Inspira over the years and the hospital's failure to support him or address his concerns.

McLaughlin recounted during the trial that he "couldn't believe what [Matusow] said because I knew that was not a good thing to do to a board that was going to decide whether you were going to be on staff or not." "[I]nstead of . . . being conciliatory and cooperative, he was more aggressive and attacking them, accusing them of . . . having an ax to grind with him and . . . that they were his enemies."

A-1796-19

Matusow's loss of privileges impacted the day-to-day work and responsibilities of McLaughlin and Izanec. They had to be on call every other weekend rather than every third weekend, and they spent more time going to the hospital for emergency procedures and to see patients. The additional work and responsibility impacted the other doctors' family lives and personal time. Matusow acknowledged his loss of privileges was "tremendously burdensome" on McLaughlin and Izanec.

In addition, part of the doctors' compensation was based on productivity. Performing procedures at the Endo Center was more productive than making rounds or doing procedures at the hospital, so the increased call responsibilities also decreased McLaughlin's and Izanec's productivity-based compensation.

According to McLaughlin, he and Izanec discussed the issue of amending the employment agreements to address the consequences of Matusow's loss of privileges "[m]any times."

In an August 9, 2015 email to McLaughlin and Matusow, Izanec listed this issue as the first of several the partners needed to resolve, stating:

> In our current partnership agreement, it is a requirement that each partner have privileges at Inspira Vineland. As this process has drawn out, that appears less likely. While I hold out hope that [Matusow] will get privileges, it seems at times I am the only one who believes that is still possible – perhaps because I know

A-1796-19

the least about the history and current situation. Should [Matusow] not get his privileges back, that sets off a chain reaction – one of those consequences is that [Matusow] is in violation of our own agreement, so we must rewrite our contract amending that requirement . . . .

McLaughlin and Izanec proposed an arrangement under which they would be compensated for doing the call duty that Matusow could not, a concept referenced at trial as a "call penalty." Matusow was not amenable to the idea because he did "NOT elect to be in this scenario." As McLaughlin explained:

He thought it was not his fault, it was somebody else's fault, it was [Garrison's] fault, and since it was somebody else's fault it made it okay that he wasn't taking call and that made it okay that [Izanec] and I had to work harder because it was somebody else's fault, and therefore it wasn't his responsibility to make up for it.

Also in August 2015, the doctors' attorney informed them it was likely that Inspira was going to deny Matusow's application for privileges. McLaughlin described this as "disastrous" and a "huge problem" for the practices because an official rejection would have been a "reportable event," meaning an occurrence the practices have to report to the State Board of Medical Examiners (BME), which could result in Matusow losing his medical license. Matusow "was already under scrutiny" from the BME at that point.

A-1796-19

Counsel advised that if Matusow withdrew his application using "certain wording," the application process and denial would no longer be considered a reportable event. If Matusow refused to withdraw, his only recourse after rejection of his application would have been "a fair hearing process and [to institute suit] against the hospital in order to move forward." Counsel advised that process could cost over $1 million in attorney's fees and costs.

Matusow believed the practices should bear the cost of the fair hearing process, but McLaughlin was not willing to have all three doctors share the cost, particularly because he thought Matusow was "going to likely lose." McLaughlin and Izanec thought Matusow "should bear the burden himself . . . ." Matusow decided to withdraw his privileges application. Despite the challenges regarding the privilege situation, McLaughlin testified there was no discussion of terminating Matusow even though his loss of privileges was a violation of the employment agreement.

The doctors faced additional issues in 2015. McLaughlin raised an ongoing discussion concerning his thoughts that the practices "should bring in a more highly qualified practice administrator" than Garrison, but he and Matusow could not agree on a person to hire or a plan for delegating responsibilities. In addition to the privilege renewal applications, Garrison

14

handled payroll, oversaw the billing, hiring and firing of employees, advertising, credentialing, and "all of the HR stuff."  She also performed bookkeeping tasks for Matusow personally and for his "professional corporations that owned real estate," including the LLC.  McLaughlin thought it was too many responsibilities for one person.

Another issue was Matusow's request to reduce his salary to lower his alimony obligation.  He proposed taking a salary reduction for himself and increasing the rent paid to the LLC to compensate for his loss.  However, because the increased rent would effectively lower McLaughlin's and Izanec's compensation as well, they did not agree to any increase without receiving some benefit in return.  McLaughlin testified that they discussed the possibility of "work[ing] something out so that we would get paid more", but that "was a detailed, complex financial maneuver" that never came to fruition.  He and Izanec never agreed to amend the lease or increase the rent.

Throughout 2015, the doctors were also attempting to recruit another doctor to join the practices, but the number of unresolved issues stymied their recruitment efforts.  In particular, Matusow's inability to take call duty made the practices less appealing to other doctors because "the less they were on call the more easy and attractive it was to recruit and bring doctors in."

15

In October 2015, Matusow obtained privileges at Cooper University Hospital in Camden, which enabled him to continue performing procedures at the Endo Center. However, this did not solve the issue of McLaughlin and Izanec being the only two doctors who could do call duties.

Some months earlier, in the spring of 2015, the doctors brought in Thomas Byrne, the practices' former accountant, as a consultant to assist them with working out some of these matters. Byrne urged the doctors to meet to discuss their disagreements, including the call penalty, contract and rent issues, physician recruitment, and the current productivity formula.

In an email, Matusow stated he was willing to meet, but only if Byrne was present as "an 'adjudicator' type person . . . ." He reiterated that he should not be penalized because of Garrison's mistake in not timely submitting the privileges renewal application. And he asserted he could only get his privileges reinstated if McLaughlin and Izanec agreed to have the practices pay for the costs of the fair hearing process. He stated that his perspective was "a totally different one" from theirs "and thus, we're already at a stalemate."

Byrne testified that the relationship among the doctors continued to deteriorate through 2015 and into 2016 and he withdrew as an advisor to the practices in March 2016.

16

Around the same time, a conflict arose between Matusow and the nursing staff and anesthesiologists who provided services to the practices regarding the choice of sedation for patients undergoing endoscopic procedures.

Matusow presented Adam Elfant, M.D. as an expert in the field of gastroenterology. He was the head of the Division of Gastroenterology and Hepatology at the Cooper Health System. Dr. Elfant described the different levels of sedation used during endoscopic procedures. He said "[c]onscious sedation is basically sedation provided by a physician." It is a light intravenous sedative "to provide minimal or lack of recall . . . ." "The purpose of it is to keep the patient comfortable while allowing us to complete our procedure."

Dr. Elfant testified that conscious sedation was used into the early 2000's. Then Cooper Health decided to change over the sedation process "to allow the Department of Anesthesia to provide each sedation or modern anesthesia care for the endoscopic procedures performed." The decision was based on both safety and efficiency considerations.

Dr. Elfant testified that, in the South Jersey area, "the majority, though not all, of gastroenterologists utilize anesthesia services for performance of procedures."

17

Dream Partners, LLC, owned by Dr. Scott Hernberg, provided anesthesiology services to the Endo Center beginning in January 2011. Although Hernberg and the other anesthesiologists with his company had "done over 5,000 cases collectively for Dr. Matusow alone" over the years, he testified that he "had difficulty having discussions with [Matusow] because he simply wouldn't necessarily cooperate with me, he would just ignore the situation."

Belinda Sacco, the nurse manager at the Endo Center, began working with Matusow in 1994. She testified that Matusow used "I.V. conscious sedation" for his patients. When McLaughlin joined the practices in 2011, he used anesthesia services. Matusow switched to anesthesia services in early 2012.

Sacco said she had "a good working relationship" with Matusow. However, an incident occurred in February 2016 which soured the relationship. On that day, the anesthesiologist working at the Endo Center would not clear a particular patient for a procedure at the scheduled time, either because he wanted to delay the patient that day because of safety issues or schedule the procedure on a different day. According to Sacco, Matusow became "irate" and said he would do conscious sedation himself, even though the anesthesiologist believed "it was too risky."

A-1796-19

Matusow wanted Sacco to assist him in giving the patient conscious sedation, but she refused. Sacco testified that she thought her "license would be in jeopardy" if she assisted Matusow after "the anesthesiologist had already documented on the record that it was not appropriate for the patient . . . for the safety of the patient."

Matusow was "screaming" at Sacco in the lunchroom that she "was going to help him . . . ." Jennifer Steffler, another nurse who had worked at the practices since 2006, told Matusow to stop screaming at Sacco, and questioned whether he had privileges from Cooper to do conscious sedation. Matusow became even more irate and yelled at Steffler, at which point McLaughlin "came over . . . to try to sort through it." McLaughlin characterized the scene as a "confrontational yelling match."

Although Matusow tried to persuade the patient to have an unsedated procedure, the patient refused and left that day without having the procedure performed.

Sacco described several similar incidents that occurred in 2016 where the anesthesiologist would not clear a patient for a procedure because of a health issue or safety concern. On those occasions, Matusow asked Sacco to assist with conscious sedation and she refused. Sacco also explained she began to

A-1796-19

have issues with staffing because per diem nurses would only agree to work on days when an anesthesiologist was present.

Another issue regarding conscious sedation arose, this time concerning the number of staff required for conscious sedation procedures. Sacco explained that "standards and regulations change over the years" and, a few years before 2016, the Centers for Medicare and Medicaid Services (CMS) changed its standards. The new standards required that surgical centers such as the Endo Center "were held to the same standard of care as a hospital, no matter where the procedure was being done, it should be done under the same circumstances."

Sacco testified this meant that the standard of care for nursing was that "the nurse in the room monitoring the patient under conscious sedation should not have any other responsibility that would interrupt her ability to monitor that patient, observe that patient . . . immediately before, during and after the procedure." Because a nurse could not meet this standard and, at the same time, assist the doctor with the technical tasks that needed to be performed during a procedure, Sacco advised that a minimum of two nurses had to be in the room when a doctor used conscious sedation.

Although Sacco had assisted Matusow for many years as the only nurse in the room before the practices started using anesthesiologists in 2011, she

20

testified that for the limited number of conscious sedation procedures performed after that, she "would have two nurses in the room." Starting with the incident in February 2016, Matusow only wanted one nurse to go in the room to assist him with conscious sedation, but Sacco refused to comply with Matusow's demand.

McLaughlin and Izanec also told Matusow that, if he was performing a procedure, he could not do conscious sedation without two nurses being present. McLaughlin said he was "concerned about taking risks about . . . having patients have complications and bad outcomes", and he "thought it was safer to have either two doctors and a nurse or two nurses and a doctor" present for procedures, but Matusow "wanted to use less." Matusow insisted there was no reason why he could not use a single nurse for a conscious sedation procedure if two were not available.

Disputes regarding anesthesia services continued that spring. On May 9, 2016, Hernberg recommended against using anesthesia on one patient who was about sixty years old and "had a history of a heart attack in his [thirties]", and he also recommended delaying the procedure for two hours for another patient who drank coffee, against medical instructions, before coming to the office. Hernberg "heard doors slamming" and said Matusow "seemed pretty upset." At

21

some point in the day, Matusow told Hernberg, "I'm never going to work with you again."

On May 18, Matusow's counsel emailed McLaughlin and Izanec, informing them that Matusow was thinking of leaving the practices. McLaughlin testified that if Matusow left the practices it would be "a huge problem to try and get over," both because it would be difficult "to try to recruit and replace someone," and because of issues likely to arise from the "adversarial departure of one of our partners who has a long history of litigation."

McLaughlin said he and Izanec spent many hours talking to Matusow, trying to help him understand the problems the practices were facing. The doctors attempted to have meetings to resolve the issues, but McLaughlin said they ended up being "dysfunctional" and unproductive.

By May 2016, three of the Endo Center's four full-time nurses—Sacco, Steffler, and Laurie Nardelli—were "uncomfortable working with [Matusow], [and] voiced that they didn't want to be in the room." Several part-time nurses also said that they "were not comfortable" working with Matusow.

Nardelli testified that her difficulties with Matusow arose out of his performance of unsedated procedures. She stated that Matusow would not explain to the patients why the anesthesiologist was not there, but "in the room

22

when some of them were having some pain or some difficulty" during an unsedated procedure, Matusow told the patients that it was Nardelli's "fault that they weren't getting sedation because I wouldn't help him with sedation." She recalled Matusow saying that to several patients. After Matusow learned Nardelli had complained to McLaughlin, Matusow told her that she would need to find another job as soon as he found "somebody that was going to give sedation with him . . . ."

Steffler also testified during the trial, stating that, once Matusow "would no longer work with the anesthesiologist and was trying to do his own conscious sedation", the practices did not always have sufficient staff available for two nurses to assist with the procedure. She recalled one day when Matusow would not cancel procedures even though there was insufficient staffing. As he stood next to Steffler, Matusow told a patient that the nurses should "have a guilty conscience for what [they] were doing . . . ." According to Steffler, Matusow then "coerced the patient into moving forward with the procedure" without any sedation. The patient was not given "the option to re-schedule and have anesthesia or sedation at the later time."

Sacco recalled another incident where Matusow performed an unsedated colonoscopy on a patient, telling the man: "You're going to have the procedure

23

done without sedation.  That's the way I had mine done."  Again, the patient was not given any alternative to re-schedule the procedure when an anesthesiologist was present.

Due to the staffing issues, McLaughlin and Izanec were forced to close the Endo Center for the day on June 1, 2016, because they knew there would not be sufficient staff to allow Matusow to do conscious sedation and they thought doing unsedated procedures without the advance consent of patients was not in accord with the practices' standards.  As Izanec explained in an email to Matusow on May 31, 2016:

> Given that we do not have an anesthesia provider for tomorrow's cases, and since we do not have nurses on our current staff who agree to provide conscious sedation with you tomorrow, we are going to close the [Endo Center] . . . tomorrow, June 1st 2016.
>
> Vince and I do not feel that doing unsedated cases on patients without their advanced consent is up to our standards.  As of now no patients have been notified that there is no sedation capability for tomorrow.  You have refused to notify them.  You have forbid [sic] us from notifying them.
>
> While we recognize that these are your patients, we feel it is our obligation to tell these patients about the current limitations we have in providing their care.
>
> The nurses have been informed that we are closed tomorrow and that they are not to come in.

24

> We continue to want to work to find a long term solution to this issue and develop a plan for action for your next endoscopy day, Monday June 6th.

On June 15, 2016, McLaughlin and Izanec were copied on a long and rambling email written by Matusow that he stated was "a PRELUDE to one of the last Chapters in my autobiography book. 'Death of a Gastroenterologist.'" He blamed the other doctors, the anesthesiologists, and Sacco for the issues at the Endo Center, and he blamed the threatened loss of his license on the ignorance of the BME. He also detailed the stress he was experiencing from having a bad relationship with two of his three children, paying alimony to his ex-wife, undertaking renovations to his beach house, and taking care of his personal needs.

When questioned at trial why he and Izanec did not move to terminate Matusow after getting the four-page email, McLaughlin explained that "[t]he loss of a partner would have been, again, very problematic for taking care of patients," especially because there was "a shortage of GI doctors in the area." He stated he "thought that we could still figure out a solution." Also, knowing Matusow's "litigious nature and lawsuits," McLaughlin said he was "as sure as we sit here in the courtroom today, after two years, that we were going to get into a lawsuit with him if we fired him."

A-1796-19

In mid-June 2016, the practices' accountant – Salvatore Scelsi – made a $30,000 distribution to Matusow from the Endo Center without the knowledge of the other doctors.[4] Scelsi later informed McLaughlin and Izanec that Matusow "needed to receive his distribution [by a certain date] for personal reasons." Izanec advised Scelsi that no distribution should be made to any doctor without the knowledge of all three and the consent of at least two.

In July 2016, more than a year after Matusow lost his privileges at Inspira, the doctors continued to discuss options to address the call burden placed on McLaughlin and Izanec. McLaughlin put together a specific written proposal with a formula to compensate himself and Izanec for their additional call duties. In the memo, McLaughlin acknowledged the doctors were confronting many issues, but he believed the call burden needed to be immediately resolved.

McLaughlin prepared his proposal after researching what other practices did and how much doctors "were getting paid to cover call on weekends." He testified that he doubted Matusow would agree to the call penalty, and in fact, Matusow did not even respond to the proposal.

---

[4] McLaughlin explained that the doctors' salaries came from the Gastro Group. They periodically distributed the profits from the Endo Center in three equal shares.

A-1796-19

McLaughlin testified that he and Izanec discussed the possibility of amending the employment agreements to allow for Matusow's lack of privileges at Inspira if all three could agree on how the other doctors would be appropriately compensated, but they never reached a consensus. McLaughlin also stated he and Izanec were not willing to waive the privileges requirement in the existing agreements.

In the midst of these ongoing disputes, the practices had successfully recruited a fourth doctor, Theresa DiSandro, who was expecting to join the group on August 1, 2016. She was a former colleague of Izanec.

In late June, Matusow emailed McLaughlin and Izanec that he was "NOT liking" the scenario as he already perceived that he was outnumbered on any disagreement and, once DiSandro joined, it "will be 3 vs. 1." As president, Matusow needed to sign DiSandro's employment contract, but he had not done so.

McLaughlin testified he became "concerned" that Matusow would "abuse his powers" as president by refusing to sign DiSandro's employment contract even though she had severed her ties with her prior employer and was within a few weeks of joining the practices. They had already set up a full schedule of patients for her. Although Matusow still refused to sign her contract, DiSandro

27

began working on August 1, 2016. DiSandro left the practices about six months later.

A new issue arose in August 2016 regarding whether Matusow had privileges to perform liver biopsies. Under the Endo Center by-laws, the doctors had privileges to do any procedure at the Endo Center that they had privileges to perform at a hospital. While Matusow's Inspira privileges included liver biopsies, his Cooper privileges no longer did.

In accordance with the by-laws, McLaughlin and Izanec told Matusow he could no longer perform liver biopsies at the Endo Center. Nevertheless, Matusow continued to do the procedures, and later attempted to give himself privileges to perform the procedure by making a unilateral, handwritten change to the bylaws unapproved by McLaughlin and Izanec.

An additional contentious issue among the doctors at this time was the planned expansion of the building to include a second endoscopy room. The Endo Center lacked sufficient room for the four doctors' scheduled procedures, requiring some to be done at the hospital, which was inefficient for the practices. McLaughlin explained that with the addition of DiSandro, "it was crucial from a standpoint of operation and patient care" that they add the second room.

A-1796-19

Although Matusow had initially agreed that the practices needed the second room, he told the other doctors in August 2016 that under the lease, they needed his approval, and he was not going to give it. In September, McLaughlin persuaded Matusow to agree to the expansion and construction on a second procedure room began.

According to McLaughlin, he and Matusow remained at odds over many issues relating to the practices, and by October 2016, Matusow told McLaughlin he no longer wanted to speak to him. McLaughlin testified this obviously made resolving their problems "impossible . . . ."

On October 18, 2016, McLaughlin sent Matusow notice of a special meeting of the Board of Directors to be held on October 28 to discuss Matusow's termination under paragraph 2(f) of his employment agreement, which allowed for termination without cause upon ninety days' notice. Matusow told McLaughlin "this was going to create World War III."

On the day of the meeting, Matusow's counsel sent McLaughlin and Izanec a letter attaching an "Addendum to Dr. Matusow's Employment Agreement deleting paragraph 2(f) therefrom." The Addendum was signed by Matusow as both president and employee. Counsel's letter stated that because "Dr. Matusow's Employment Agreement no longer contains paragraph 2(f),

which was to be the subject of this evening's Board meeting . . . , we shall assume that tonight's meeting has been cancelled."  McLaughlin and Izanec had not approved the Addendum.

Nevertheless, the meeting took place with McLaughlin, Izanec, and Matusow all present.  McLaughlin testified he hoped that with the threat of termination, Matusow would realize he needed to take responsibility for and resolve some of the problems caused by his actions.  That did not occur.

Therefore, McLaughlin and Izanec voted to terminate Matusow "without cause."  McLaughlin said they took this action so "there would be a period of time that we can continue to try and resolve it with more meetings and proposals as to what he could do as opposed to a for cause [termination] which would mean immediate stopping of his salary . . . ."  They gave Matusow ninety days to continue working as an employee, and informed him he would be terminated for cause if they could not work out their issues during that time.

McLaughlin informed Matusow that under the terms of the employment agreement, he could not see patients or perform procedures during the ninety-day period.  The staff was told Matusow was on a sabbatical and they were to give patients the same information.

30

McLaughlin testified that Matusow was terminated for the following reasons: he (1) "refused to take responsibility for his role in the problems that he was creating"; (2) "was an abusive president", as shown by his efforts to rewrite by-laws to give himself liver biopsy privileges, unilaterally rewrite his own employment contract, and block or delay the second endoscopy room and DiSandro joining the practices; (3) lost his privileges at Inspira; (4) "wasn't able to perform his duties as an employee, specifically take work on the weekends, take weekend call, take emergency call, round at the hospital, see hospital patients, both regularly every day or emergently"; and (5) "caused huge problems with the way he treated his staff", which "created significant staff shortages" that led to "problems scheduling patients and going forward."

McLaughlin stated he was also concerned about Matusow's medical judgment in treating patients and performing procedures for which he did not have privileges, despite being told not to. McLaughlin also stated he and Izanec were unable to stop Matusow from taking risks with his patients. Finally, McLaughlin expressed concerns about Matusow's business judgment, stating his "solutions to problems were irrational, or illogical, or not financially sound."

A-1796-19

## II.

Two weeks after McLaughlin and Izanec voted to terminate Matusow, he filed a verified complaint against the two doctors and the practices in the Chancery Division (the Chancery case). Matusow asserted that: (1) Izanec and McLaughlin, "as majority shareholders, abused their authority and acted oppressively unfairly toward [him] in his capacity as minority shareholder, director, officer and employee of the Gastro Group and have acted fraudulently and illegally, and have mismanaged the Gastro Group"; (2) Izanec and McLaughlin breached their fiduciary duty to Matusow; and (3) defendants breached the implied covenant of good faith and fair dealing in the employment agreement between Matusow and the Gastro Group.

Matusow asked the court to: (1) temporarily restrain defendants from terminating his employment and from interfering with his "normal professional business activities" with the practices; (2) direct Izanec and McLaughlin to sell their shares of the Gastro Group and Endo Center to him; (3) award "all expenses and attorney's fees pursuant to N.J.S.A. 14A:12-7;" and (4) award compensatory and punitive damages. Defendants filed a cross-motion for an order compelling arbitration.

Also in November 2016, Matusow as owner of the LLC, rescinded his permission to construct the second endoscopy room. By that time, the practices had incurred costs for the construction, custom cabinets, and supplies.

In December, counsel for the LLC sent a notice to "cease violations of lease" to the practices, demanding repayment of over $53,000 in insurance premiums paid for premises liability coverage from October 2013 to April 2017 (the collection case). Although the 2013 lease required the Endo Center and Gastro Group to obtain such insurance directly, the practices never did so under Matusow's presidency. The LLC bought the insurance itself.

The office manager, Garrison, testified when she took over accounting, she was instructed to pay the insurance through the LLC. At the time, Matusow was the sole owner of the company and the only doctor in the practice.

The LLC subsequently filed two eviction actions seeking possession of the building it owned, and in which the Gastro Group and Endo Center operated. These actions were later consolidated with the Chancery case and the collection case.

On January 12, 2017, McLaughlin and Izanec notified Matusow that his termination was for cause. After Matusow disputed the propriety of the notice, the doctors held a shareholders' meeting in March 2017 during which Matusow

33

was terminated for cause. Subsequent attempts by the doctors to resolve the litigation were unsuccessful.

In response to Matusow's application for a preliminary injunction, the Chancery court issued an order, that among other things, denied his request for reinstatement, and required the Gastro Group to continue paying Matusow at his current rate. After McLaughlin and Izanec requested a modification of the order "on account of financial exigencies," the court issued a new order which provided that "rather than continuing to pay a salary" to Matusow, Izanec and McLaughlin could "elect instead to pay zero salary" to themselves and Matusow.

Matusow moved for reconsideration of the zero-salary order and, on June 8, 2017, the court granted the motion in part and denied in part. The order stated:

> (a) The [d]efendants are directed to pay 1/2 of Dr. Matusow's salary effective July 1, 2017, and on [the] first of each month thereafter, so long as his license is in good standing;
>
> (b) Doctors Izanec and McLaughlin may receive salaries;
>
> (c) Any payments made pursuant to [the] Dec. 19th order or this order may be reclassified at time of trial as payments toward Dr. Matusow's share in [the] practice[s]; [and]
>
> (d) The practices may make application for approval of counsel fees.

A-1796-19

On June 20, 2017, defendants filed an answer and counterclaims in the consolidated actions. They asserted the following causes of action against Matusow alone: (1) a declaratory judgment claim seeking an order that (a) Matusow's termination was proper under the terms of his employment agreement; and (b) the employment agreement and shareholder agreement "dictate[d] the terms of . . . [d]efendants' buyout of Dr. Matusow's shares"; (2) claim for relief under N.J.S.A. 14A:12-7, specifically seeking the sale of Matusow's shares "to the corporation or its other shareholders"; (3) breach of fiduciary duty; (4) tortious interference with prospective contractual relations; and (5) defamation.

Defendants asserted claims against Matusow and the LLC for breach of contract; violation of the doctrine of good faith and fair dealing; unjust enrichment; and conversion. They alleged claims of promissory estoppel against the LLC.

Izanec left the practices in September 2017 and became employed with a pharmaceutical company. McLaughlin said Izanec "stopped showing up", but never officially resigned. Garrison left the practices in August 2017.

A few months before trial began in October 2018, Matusow sued the practices and McLaughlin personally in small claims court over the payment of

<span>A-1796-19</span>

a $2800 bill for a problem with the Endo Center's sewer system.  McLaughlin

offered to pay the full $2800, even though he believed that the practices did not

cause the problem, so that he would not have to cancel patients to appear in

court, but he got no response.  Matusow dismissed the case, but then refiled the

complaint, this time naming both Sacco and McLaughlin personally as well as

the practices.[5]

III.

During the pendency of this litigation, an additional issue arose requiring

resolution by the Chancery court.  It involved the doctors' billing procedures.

Each of the three doctors had an individual National Provider Identifier

(NPI)[6] used for billing insurance companies for services rendered.  In September

2017, nearly a year after Matusow stopped working at the practices, McLaughlin

became aware for the first time that the practices had submitted bills listing

---

[5] It appears that the small claims matter was never formally consolidated with the other matters, but the trial court addressed and dismissed it nevertheless in the final judgment.

[6] The NPI is a unique identification number for covered health care providers. Covered health care providers and all health plans and health care clearinghouses must use the NPIs in the administrative and financial transactions adopted under HIPAA. CENTERS FOR MEDICARE AND MEDICAID SERVICES, https://www.cms.gov/Regulations-and-Guidance/Administrative-Simplification/NationalProvIdentStand (last visited July 13, 2021).

Matusow as the billing provider and using Matusow's NPI even when McLaughlin or Izanec was noted on the bill as the service provider. This process had continued even after Matusow left the practices.

Gayle Phillips, who worked in accounts receivable at the practices from about 2010 to March 2018, testified that from the time McLaughlin joined the practices, all bills related to the "Medicaid HMO products" always listed Matusow as the billing provider because neither McLaughlin nor Izanec participated in those insurance coverages. McLaughlin or Izanec was listed as the service provider for the procedures each performed. Another Gastro Group employee who handled billing testified that Garrison instructed her to bill McLaughlin's work under Matusow's NPI beginning in 2011. The employee stated she did not think McLaughlin was aware of this billing structure until after Garrison resigned.

During her testimony, Garrison acknowledged she was aware that Matusow's NPI was still being used for billing after he left. She explained that when McLaughlin and Izanec started with the practices, "they were never credentialed through [Horizon] NJ Health",[7] which is a process that "takes time

_____

[7] Garrison's recollection was that the credentialing issue only happened with Horizon NJ Health, but Phillips and McLaughlin testified that it occurred with other insurers as well.

. . . ." She said the billing department continued to submit bills under Matusow's NPI after he left until the other doctors "were credentialed."

McLaughlin testified that after Garrison left, he reviewed a report in September 2017 generated by the new billing supervisor that showed charges and collections under Matusow's name. It was then that he discovered the billing department was still using Matusow's NPI. Prior to that time, and after Matusow left the practices, McLaughlin had received reports from Garrison stating "there were no charges or collections under [Matusow's] name."

McLaughlin testified he "put a stop to it immediately" when he learned procedures were being billed under Matusow's NPI. He told the staff to change the software system so that Matusow's NPI would no longer be used. And he obtained his own credentials and used his own NPI for all billings thereafter.

McLaughlin testified it was Garrison's responsibility as office manager to make sure the doctors were credentialed for purposes of billing Horizon and the other insurance companies and that she had all the information she needed to obtain those credentials. He thought that Matusow, as president, "should've overseen whether the billings were done properly or not."

At some point after his departure, Matusow reported the practices' use of his NPI to insurance carriers, the BME, and the New Jersey Office of the

A-1796-19

Attorney General (AG).  In June 2018, an investigator employed by Horizon –

Dani Marks – advised the practices that Horizon was "conducting a post payment

review of claim submissions relative to members being seen in your practice",

and it was required "to conduct an on-site review of medical records."

After his review, Marks wrote a letter to the practices with details of the

audit (post-audit letter).  He explained that Horizon examined: (1) claims using

specific "CPTs"[8] from "January 1, 2014 – October 28, 2016 (Dr. Matusow's last

day at [the practices]) where Dr. Matusow's NPI number was used for claims"

---

[8]  The record does not include an explanation of the term CPT, but as one online
article explains:

> Current Procedural Terminology (CPT codes) are
> numbers assigned to every task and service a medical
> practitioner may provide to a patient including medical,
> surgical, and diagnostic services.  They are used by
> insurers to determine the amount of reimbursement that
> a practitioner will receive by an insurer for that service.
>
> Since everyone uses the same codes to mean the same
> thing, they ensure uniformity.  CPT codes serve both
> tracking and billing purposes.
>
> [Tricia Torrey, An Overview of CPT Codes in Medical
> Billing, VERYWELLHEALTH, Sept. 15, 2020
> (https://www.verywellhealth.com/what-are-cpt-codes-
> 2614950).]

A-1796-19

(period one claims); and (2) all claims made "[f]or the period from October 29, 2016 through October 2017" (period two claims).

In its review of the period one claims, Horizon noted nine categories of records in which it found overpayments totaling $300,883.

Marks explained that Horizon reviewed the period two claims to "determine if records were being wrongfully signed as if the services were being provided by Dr. Matusow to cover his absence." Marks stated Horizon found "[t]his was not the case as the records accurately reflected the identities of the non-credentialed providers." Nevertheless, the letter continued:

> Analysis of the dates of service reviewed during this billing period revealed that none of the claims submitted were for services provided by Dr. Matusow. Accordingly, all services claimed were wrongfully made using his NPI and resulted in an overpayment of $542,875.
>
> Considering the aforementioned, we conclude that your actions represent a knowing misuse of provider identification numbers which has resulted in improper billing practices and material misrepresentations. We are seeking reimbursement of medical claims made for [Horizon New Jersey Health] patients seen by other providers during the review period totaling $838,744.

Marks testified at trial regarding the period two claims. He was not asked any questions regarding the period one claims.

40

As stated previously, the BME had begun an investigation of several of Matusow's cases in 2015. After its review, the BME found "cause for disciplinary sanction against [Matusow] . . . ." In a May 2018 consent order entered into with the BME, Matusow denied all allegations of wrongdoing. The consent order provided that "nothing in this settlement and Consent Order shall be construed as an admission of liability or wrongdoing" on Matusow's part.

The BME consent order provided that Matusow's "license to practice medicine and surgery in the State of New Jersey is suspended for a period of three years, with seventeen months served as a period of active suspension" and "the remainder stayed and served as a period of probation." The suspension retroactively began on October 28, 2016, the date Matusow "voluntarily ceased practicing medicine."

The consent order also noted that Matusow admitted "he renewed several of his patients' prescriptions" after leaving the practices, and "admitted calling in prescriptions for controlled substances for himself using his partner's name."

This information was gathered by McLaughlin, who learned in May 2017 that Matusow had phoned in prescriptions for controlled substances for himself using McLaughlin's "DEA number" and stating it was McLaughlin calling in the

41

prescription. McLaughlin stated Matusow had used his name and DEA number for over two years to call in prescriptions and refills for several drugs.

After consulting an attorney with expertise in the area, McLaughlin "reported to the DEA and to the [BME] that . . . Matusow was . . . calling in prescriptions using my name without my knowledge." McLaughlin testified that he was obliged by regulation to make the report.

The consent order noted that Matusow "surrendered his federal DEA registration" on July 6, 2017, and "that surrender was deemed by the DEA to be 'for cause.'" It also noted that Matusow "completed a five-day inpatient assessment at [a treatment center] . . . to address his inappropriate self-prescribing", as well as certain other recommended programs.

IV.

In October 2018, the Chancery court granted defendants summary judgment on all of Matusow's claims asserted in the Chancery case.[9] On October 22, 2018, just before the start of trial, Matusow moved to alter or amend the summary judgment order, asserting he had alleged claims that went beyond the termination of his employment that should be adjudicated.

---

[9] There was no appeal from that order. We were not provided with the transcript of the oral decision.

A-1796-19

The Chancery judge considered the motion on the first day of trial. She found Matusow could not sustain a claim for improper termination because his license was suspended under the terms of the consent order. In addition, she declined to change her ruling dismissing the shareholder oppression action. However, in addressing Matusow's claims for breach of fiduciary duty and breach of the covenant of good faith and fair dealing, the court found they were "in part based on the alleged or illegal termination of his employment," but to the extent the claims went "beyond the alleged illegal termination of employment," the court would permit Matusow to assert them during trial.

Izanec settled the case with Matusow before trial. He did not appear as a witness.

## V.

The case was tried before the Chancery court judge on the remaining claims in the consolidated actions over nine days. On February 4, 2019, the court issued a comprehensive three-hour oral decision.

In assessing the witnesses' credibility, the court found Sacco, Byrne, Hernberg, Nardelli, and Steffler credible. The court also determined Garrison was credible but noted "she was vulnerable and appeared to be overwhelmed trying to manage a two to three doctor practice and being put in the middle of

43

the meetings and some of the emails." The court did not make a specific credibility finding regarding McLaughlin, but from the overall tenor of the factual findings, it is evident the court accepted his testimony as truthful.

In considering Matusow's testimony, the Chancery court stated he "was a witness who[se] credibility is apparent only to himself. He accepts no responsibility for anything negative that has happened to him and others around him." The court found his "lack of . . . forthrightness . . . [and] lack of candor" was the result of his "habit of view[ing] everything in a light most favorable to himself and attributing evil or evil motives to those around him who are attempting to work with him." The court described Matusow as living in an "[alternate] universe and [he] doesn't see how wrong he is about so many things."

In ruling on the claims of minority shareholder oppression, the Chancery court found that because all three doctors were one-third shareholders, they were all minority shareholders. The judge stated that Matusow had not proven his shareholder oppression claim. She noted that an oppressed shareholder must show his or her reasonable expectations were frustrated; Matusow had not done so.

A-1796-19

However, the judge found McLaughlin and Izanec had proven their claims of shareholder oppression because their expectations were "frustrated by Dr. Matusow's lack of leadership as a president with his changing his mind twice [about] the important second endo room that would accommodate more doctors and more patients."

The court found that all the doctors had an expectation of growing the practices when they entered into their employment agreement. However, Matusow attempted to thwart, and did stall, the recruitment of DiSandro. The judge stated Matusow's behavior "negatively affected [the practices'] ability to recruit more gastroenterologists into the gastroenterologist deficient Vineland area into the future."

In addition, the court found Matusow "abused his position of trust and control as president when he changed the bylaws to give himself liver biopsy privileges in August 2016", and when he unilaterally amended his employment contract before the October 28, 2016 "meeting at which his termination was to be considered and ultimately was decided."

The judge also addressed defendant's breach of fiduciary duty claim, finding Matusow breached his fiduciary duties as president of the practices. Specifically, the trial court found that "Matusow violated his fiduciary duty" to

the practices by "failing to put into place proper billing practices" when McLaughlin and Izanec joined the practices. The court stated that Matusow "allowed the bills for procedures to be submitted under his own provider number and did not see . . . that the bills were properly prepared under the correct doctor's billing numbers."

The court found that Matusow continued to violate his duty even after he was terminated when he learned the practices were still using his NPI and "instead of performing his duty as a director to notify those entities and to correct the situation[,] he reported it as fraudulent billing to the providers and yet he set that system in place and he had to know it was not fraudulent." The court found that Matusow "did this to inflict maximum harm and further financial stress" on defendants.

Therefore, the court ordered Matusow to "indemnify and hold harmless" defendants "for any liability or penalties" sustained "as a result of the billing method put in place and authorized by Dr. Matusow."

The Chancery court also found defendants had proven their claim of unjust enrichment. Defendants asserted three categories of damages: (1) the costs incurred for the aborted construction of the second endoscopy room, (2) rent overpayments, and (3) several categories of payments for services, including

utility bills, landscaping services, and snow removal costs that should not have been charged to the practices.

The court concluded Matusow had received a benefit from the overpayments of rents and other services, as well as the payment of construction costs, and that the retention of the benefits would be unjust. Therefore, the court entered judgment in favor of defendants and against Matusow and the LLC in the amount of $338,155 on their claim for unjust enrichment.

At the close of the oral decision, defendants' counsel inquired whether defendants were entitled to attorney's fees on the indemnification of the insurance billings. The judge replied that she did not know. However, she then advised counsel that defendants were entitled to counsel fees on their minority shareholder oppression claim under N.J.S.A. 14A:12-7(10). She requested counsel to submit a certification of services. Defendants' subsequent submission requested over $1 million in attorney's fees and costs.

On April 30, 2019, the court issued an oral decision on the issue of counsel fees. The judge noted the application for fees was authorized under N.J.S.A. 14A:12-7(10) but any award was discretionary and the court had to find Matusow acted arbitrarily, vexatiously, or in bad faith.

47

In determining that Matusow did not act in bad faith, the Chancery court relied on Belfer v. Merling, 322 N.J. Super. 124, 146 (App. Div. 1999) (holding that the plaintiff, who "had built up the business for thirty years," did not act in bad faith "merely by acting to prevent himself from being frozen out of his own company").  After noting the facts present here, the court stated:

> Dr. Matusow believed he was the victim of a conspiracy to remove him from his own practice.  In these circumstances it was not bad faith for Dr. Matusow to litigate that decision.  Like the Belfer plaintiff, Dr. Matusow was acting to prevent himself from being removed from his own practice of thirty years.

However, the court added:

> Notwithstanding that, . . . in my view, . . . there are circumstances in the record that support that Dr. Matusow was vexatious and arbitrary . . . at times. . . . [W]e do know the normal meaning of arbitrary, and basically it can be power without limitation, uncontrolled or unrestricted and not based in good judgment.
>
> Vexatious, most often that [is used] in terms of vexatious or harassing misuse of the judicial process.

The court found that Matusow's filing of "the Complaint and Order to Show Cause . . . [was] arbitrary and that the filing of the additional litigations in [the] Law Division[,] Cumberland County and in landlord tenant court in

Cumberland County were vexatious." Therefore, the judge determined to "limit the fees . . . to those that [she found] to be arbitrary and vexatious."

The court painstakingly reviewed defendants' fee application determined the appropriate hourly rate for each attorney, which was lower than the rate billed, and only awarded fees for work related to specific issues she found arbitrary or vexatious. Of the more than $1 million sought, the court awarded approximately $205,000.[10]

McLaughlin made a supplemental application for fees incurred as a result of Matusow breaching his fiduciary duty by making complaints to the BME and various insurance companies about the billing system he put in place. McLaughlin had retained separate counsel to represent the practices and himself before the BME and in the ongoing disputes with insurance companies and Medicare. The court awarded McLaughlin an additional $184,292.49. Therefore, the total award of attorney's fees was $389,658.72.

---

[10] During the decision, the judge noted she had made adjustments as she was ruling and therefore she did not give an exact number during the decision. However, at a subsequent hearing, the court awarded an additional $184,292.49 "in connection with the billing fraud allegations and anti-kickback scheme," so it can be inferred that the fees awarded prior to that were the difference between $184,292.49 and the ultimate fee award of $389,658.72, or $205,366.23.

A-1796-19

## VI.

On appeal, Matusow contends the Chancery court erred: (1) in finding defendants established a claim for shareholder oppression and conversely that he did not establish the claim; (2) in ordering indemnification as the remedy for Matusow's breach of fiduciary duty; (3) in its unjust enrichment award; (4) in its award of attorney's fees and costs; and (5) in finding payments made to Matusow during the litigation for salary should be credited against the amount he was owed for his shares in the practices.

We consider each argument in turn.

## A.

Although the Chancery court considered Matusow's claim for shareholder oppression in its post-trial ruling, it did not need to do so. The court had previously granted summary judgment to defendants and dismissed that claim in October 2018. Even when the court later amended its rulings regarding other causes of action, the judge stated she was satisfied that Matusow had not established an action for shareholder oppression. As there was no appeal from the summary judgment order, we need not address it here.

In turning to the counterclaim for shareholder oppression, Matusow contends the other doctors could not prove their allegations under N.J.S.A.

14A:12-7(1)(c) because they "used their combined shareholder/director majority status" to terminate his employment and "divest him of his shares." Therefore, Matusow asserts McLaughlin and Izanec were majority shareholders and could not establish a claim under the statute.

In an action brought under N.J.S.A. 14A:12-7, the claimant must show:

> In the case of a corporation having [twenty-five] or less shareholders, the directors or those in control have acted fraudulently or illegally, mismanaged the corporation, or abused their authority as officers or directors or have acted oppressively or unfairly toward one or more minority shareholders in their capacities as shareholders, directors, officers, or employees.
>
> [N.J.S.A. 14A:12-7(1)(c).]

"In determining whether a particular course of conduct has oppressed a minority shareholder . . . courts should examine the understanding of the parties concerning their roles in corporate affairs." Muellenberg v. Bikon Corp., 143 N.J. 168, 179 (1996). "[M]inority shareholders' expectations must, however, be balanced against the corporation's ability to exercise its business judgment and run its business efficiently." Id. at 179-80 (citing Brenner v. Berkowitz, 134 N.J. 488, 517 (1993)). "Mere disagreement or discord between the shareholders is not sufficient for a violation of the close corporation statutory provision." Brenner, 134 N.J. at 506.

A-1796-19

The Brenner Court explained that "[o]ppression has been defined as frustrating a shareholder's reasonable expectations. 2 O'Neal's Close Corporations § 9.29 at 132 (Callaghan & Co., 3rd ed. 1988). . . . [O]ppression is usually directed at a minority shareholder personally . . . ." Id. at 506-07.

Where "there is substantial credible evidence in the record as a whole which reasonably warrants the findings and conclusions of the trial court" as to whether a corporate official or shareholder acted oppressively under N.J.S.A. 14A:12-7(1)(c), a reviewing court should not disturb the trial court's determinations. Walensky v. Jonathan Royce Int'l, Inc., 264 N.J. Super. 276, 279 (App. Div. 1993) (citing Leimgruber v. Claridge Assocs., Ltd., 73 N.J. 450, 455-56 (1977)).

We defer to the judge's well-supported finding that the doctors were all one-third shareholders and therefore all minority shareholders. The fact that McLaughlin and Izanec could, and on occasion did, vote together to oppose Matusow does not preclude their shareholder oppression claim.

Even where a party owns more than fifty percent of corporate shares, circumstances could render that party a "minority shareholder" as contemplated by the statute. Bonavita v. Corbo, 300 N.J. Super. 179, 187 (Ch. Div. 1996). See also In re Sharkey, 272 B.R. 574, 583 (Bankr. D.N.J. 2001) ("The statute

aims to protect shareholders from the abusive exercise of power, and focuses on the relative power and ability of one side to oppress another, rather than on the percentage of stock ownership."). A court must consider "whether the misconduct thwarts the minority shareholder's reasonable expectations of his or her role in the corporation." Brenner, 134 N.J. at 509.

Here, the Chancery judge found that McLaughlin's reasonable expectation as a shareholder was that he was "recruited to help grow the practice" to address a recognized "insufficient number of gastroenterologists in that service area." The court noted "it was obvious to all that in order to grow the practice, you needed to . . . have additional Endo room equipment if you were going to have additional doctors." The court further found that McLaughlin also "had an expectation to maintain employment and to be compensated appropriately" for his "time, efforts, and professional work." McLaughlin "did not expect to manage the day-to-day operations of the practice."

The record contains substantial credible evidence to support the Chancery court's finding that Matusow mismanaged the practices as president in a way that defeated McLaughlin's reasonable expectations. The court found that "Dr. McLaughlin and Dr. Izanec's expectations were frustrated by Dr. Matusow's lack of leadership as a president with his changing his mind twice" regarding the

"important second endo room that would accommodate more doctors and more patients." Matusow "refused to attend meetings to try to resolve practice issue[s] with" the other doctors, and he "undermined the recruitment of Dr. DiSandro and negatively affected [the practices'] ability to recruit more gastroenterologists . . . ." In addition:

> Dr. Matusow abused his position of trust and control as president when he changed the bylaws to give himself liver biopsy privileges in August 2016. He abused his position of trust and control when he unilaterally amended his employment contract before the October 28, 201[6] meeting at which his termination was to be considered and ultimately was decided.

The record reflects that McLaughlin and Izanec repeatedly attempted to address the many issues and disagreements by reaching a resolution that all three doctors could accept, instead of forcing their joint will on Matusow.

The court also found that, "[t]hrough inattention to his duties as president of [the practices], Dr. Matusow did not properly supervise and instruct the bookkeeper regarding rent, utilities, snow removal, landscaping" and other charges, resulting in tens of thousands of dollars in overpayments. Matusow was president and in charge of the day-to-day operation of the practices, but he "was not paying attention to the manner in which his corporations were billing and applying rent."

A-1796-19

In sum, the evidence accepted by the trial court painted a picture of pervasive mismanagement and abuse of authority by Matusow that operated to frustrate McLaughlin's reasonable expectations as a minority shareholder and justified the grant of relief under N.J.S.A. 14A:12-7(1)(c).

B.

Matusow contends the Chancery court erred in ordering him to indemnify defendants for any liability resulting from the practices' use of his NPI for billing after his termination (NPI-related damages). He asserts the ordered indemnification is an "unwarranted and draconian remedy" that should not have been imposed because: (1) defendants did not assert a claim against Matusow for relief resulting from "his arguably legally required report to Horizon"; (2) "the potential liability for which Dr. Matusow has been ordered to indemnify the [d]efendants relates to billings made after Dr. Matusow was fired"; and (3) defendants and the court prevented him from undertaking discovery on the issue.

As stated, the Chancery judge granted this relief after finding Matusow breached his fiduciary duty regarding the billing procedures. The judge explained her finding, stating Matusow failed "to put into place proper billing practices when Dr. McLaughlin joined in 2010 and when Dr. Izanec joined in

55

March of 2014." And, more specific to Matusow's point on appeal, the court found Matusow violated his duty again after his termination when he learned the practices were still using his NPI and "instead of performing his duty as a director to notify those entities and to correct the situation[,] he reported it as fraudulent billing to the providers and yet he set that system in place and he had to know it was not fraudulent."

Our review of the record does not reveal facts that support the judge's conclusion that Matusow knew his billing system was improper. Inherent in this finding is the assumption that when Matusow set up the system and managed the practices, it was improper for the billing department to submit bills using his NPI instead of getting McLaughlin and Izanec credentialed and using their NPIs for procedures they performed. The proofs presented at trial do not support this conclusion.

McLaughlin testified that Matusow had a duty to set up proper billing procedures, but McLaughlin was admittedly ignorant regarding what the billing department was doing and why. He assumed Garrison had him credentialed as part of her job duties shortly after he joined the practices. But he never inquired. He did not testify he had any knowledge that the billing practice set up by

Matusow was improper. Furthermore, as treasurer, Izanec was responsible for overseeing the bookkeeping department and office manager.

Marks would have been the witness with the most knowledge of the propriety of the billing system Matusow set up and used before leaving the practices, but his testimony and the spreadsheet he provided dealt entirely with Horizon's claims for reimbursement of monies for billings after Matusow left in October 2016. Marks was not asked about the use of Matusow's NPI during his tenure at the practices, and nothing in his testimony suggested that it was an inherently improper billing practice to use the NPI of a doctor affiliated with a practice when a different doctor performed the procedure.

Marks also was not questioned about the post-audit letter he authored and the distinction between the period one claims and period two claims discussed in that letter. The post-audit letter itself, however, suggests that the use of Matusow's NPI itself was insufficient to create a problem with bills submitted during period one. In the letter, Horizon sought repayment of approximately $300,000 from period one, but those overpayments appeared to be connected to the use of incorrect billing codes or insufficient documentation rather than Matusow's NPI. As stated, Matusow only disputes the court's order of indemnification for period two claims.

A-1796-19

Although Garrison testified about the billing system in place before Matusow's termination, her testimony does not support the Chancery court's finding that the billing system was improper. Garrison explained that when McLaughlin and Izanec started with the practices, they were not credentialed through Horizon. The following exchange ensued:

> Q. And so how did it come about that Dr. Matusow's NPI number was used at a time after he was no longer there?
>
> A. It takes time to get credentialed through NJ Health. Once Dr. Matusow was terminated, we started the proceedings to get them credentialed through Horizon NJ Health.
>
> Q. And you just continued to use Dr. Matusow's number?
>
> A. Until they were credentialed.

Nothing in Garrison's testimony suggests that the credentialing of McLaughlin or Izanec was necessary for proper billing before Matusow left the practices.

McLaughlin testified he relied on Garrison to do the proper credentialling and billing. Garrison's testimony suggests she understood the necessity of getting the other doctors credentialed after Matusow left. However, the staff at the practices was not informed in October 2016 that Matusow had been terminated. The record does not reflect exactly when the staff was informed that

Matusow was not on "sabbatical" and would not be coming back, but it could have been as late as March 2017, following the formal shareholders' meeting where Matusow was terminated for cause.

The record does not explain the reasons for Garrison's failure to start the credentialing process between the time when she learned that Matusow's departure was permanent and shortly before her own departure in September 2017. Perhaps it was the by-product of her systemic issues of taking on too many duties and making too many mistakes. Whatever the reason, these inadequacies were not attributable to a breach of fiduciary duty by Matusow because he had long since left the practices.

Without proof that the billing system using Matusow's NPI was improper when he was still there, the damages suffered by the practices for continued use of that same system after he left cannot fairly be laid at his feet. The court's finding assumes the pre-termination impropriety of the billing system. But McLaughlin did not present any evidence to support that finding. And although three witnesses who worked directly with the billing system testified about the use of Matusow's NPI when he was still with the practices, none of them stated the billing system was inherently improper. Therefore, notwithstanding the deferential standard we accord to a trial court's finding, the court's assumption

59

here that the billing system implemented by Matusow was improper from its inception is not sufficiently supported by the record.

In addition, while the court's finding that Matusow breached his fiduciary duty by reporting the billing practices to insurers and the BME after he was terminated was supported by the credible evidence, that breach cannot reasonably be said to have caused the results of the subsequent investigation. The parties do not dispute that the continued use of Matusow's NPI after he left was an incorrect billing practice or that Horizon had the right to demand repayment, regardless of how that incorrect billing practice was discovered. Possibly, Horizon never would have discovered and investigated the problem but for Matusow's vindictive report, but that alone is insufficient to place all the consequences of the discovery of improper billing on Matusow.

While Matusow's allegations of fraud, rather than mistake, were false and his motives for reporting the billing issue were vindictive, the fact that the practices might have "gotten away with" a year of incorrect billing if Matusow's report had never been made should not absolve them from having to repay monies genuinely owed because of admittedly incorrect billings. Nothing in the record suggests that, assuming Horizon had learned of the issue from a different source or by a random audit, the amount of repayment sought would have been

60

lower or that the practices' defenses against repayment would have been different or more effective. Similarly, nothing suggests that the demanded repayment amount was higher than it otherwise would have been due to Matusow's characterization of the process as "fraud."

For these reasons, Matusow's breach of fiduciary duty cannot be deemed to have caused the NPI damages.

Despite the trial court's power to craft an equitable remedy to fit the circumstances of each case, we have stated that "the facts the judge adopts in an equity case, like any other non-jury case," are entitled to deference only when supported by sufficient credible evidence. Marioni v. Roxy Garments Delivery Co., 417 N.J. Super. 269, 275 (App. Div. 2010). Here, the trial court's remedy of indemnity was based on an assumed fact that was not adequately supported by the evidence. Therefore, the court erred in its award of indemnity to defendants for the NPI damages arising after Matusow's termination. We reverse and vacate the award of $542,875.

## C.

In awarding defendants monies on their unjust enrichment counterclaim, Matusow contends the Chancery court erred because: (1) as to the costs associated with the second endoscopy room, Matusow and the LLC received no

A-1796-19

benefit and defendants did not expect remuneration; and (2) as to the other categories of damages, unjust enrichment is inappropriate because it "is a quasi-contractual doctrine that is not availing to a party to a contract", and there was no evidence that Matusow, "the individual owner of" the LLC, "received any benefit whatsoever."

In considering these arguments, we initially note that the $338,155 unjust enrichment award to defendants was entered against both Matusow and the LLC, but the LLC has not appealed from the judgment. Therefore, any arguments raised by Matusow on the LLC's behalf are inapplicable. In failing to appeal, the LLC has waived the right to contest the final judgment.

In finding defendants were entitled to an unjust enrichment award, the court found Matusow "was not paying attention to the manner in which his corporations were billing and applying rent." The judge stated Matusow was delinquent in his duties as president of the practices and failed to "properly supervise and instruct the bookkeeper regarding rent, utilities, snow removal, [and] landscaping charges . . . ." As a result, the practices overpaid all of these bills. The court also included the construction costs for the never-completed second endoscopy room.

A-1796-19

To establish unjust enrichment, a party "must show that it expected remuneration from defendant at the time it performed or conferred a benefit on defendant and that the retention of that benefit without payment would be unjust." Woodlands Cmty. Ass'n, Inc. v. Mitchell, 450 N.J. Super. 310, 317 (App. Div. 2017) (citing VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994)).

Matusow contends that the expectation of remuneration is a prerequisite to recover under a theory of unjust enrichment and that defendants failed to demonstrate that expectation.

We disagree with Matusow's interpretation of the doctrine. As we stated in Woodlands, a party must show either the expectation of remuneration or the conferral of a benefit and, in either circumstance, "that the retention of that benefit without payment would be unjust." 450 N.J. Super. at 317. Therefore, to the extent Matusow's argument is premised on defendants lacking proof of their expected remuneration at the time benefits were conferred, it has no merit.

In finding Matusow and/or the LLC were unjustly enriched, the court combined the costs incurred in the aborted construction of the second endoscopy room, the rent overpayments, and other categories of payments for services that

it found should not have been charged to the practices. We look at each category separately.

In considering the $122,489 the practices incurred in constructing the second endoscopy room, we agree with Matusow's assertion that the proofs do not satisfy the elements of unjust enrichment. Defendants have not demonstrated that a benefit inured either to the LLC or to Matusow personally from the practices' expenditure. The payments did not go to the LLC or Matusow, and there was no evidence that the partial construction and purchase of cabinets and supplies increased the value of the property. If a party received no benefit, it cannot be unjustly retaining that benefit. It was error to award the second endoscopy room construction costs to defendants as damages on their unjust enrichment claim.

However, we are "free to affirm the trial court's decision on grounds different from those relied upon by the trial court." State v. Heisler, 422 N.J. Super. 399, 416 (App. Div. 2011) (citing Isko v. Plan. Bd. of Livingston, 51 N.J. 162, 175 (1968), abrogated on other grounds, Com. Realty Res. Corp. v. First Atl. Props. Co., 122 N.J. 546, 565 (1991)). See also Hayes v. Delamotte, 231 N.J. 373, 386-87 (2018) (stating that "[a] trial court judgment that reaches the proper conclusion must be affirmed even if it is based on the wrong reasoning").

As stated, the Chancery court found Matusow breached his fiduciary duty when he refused to agree to the construction for a second time; that finding is well supported by the record. As both shareholder and president, Matusow owed a continuing duty to the practices to act in their best interest, yet he used his authority as landlord to stop the construction. The record reflects this action was nothing more than vindictive retaliation for his termination without cause.

Therefore, the $122,489 expenditure should have been characterized as damages proximately caused by Matusow's breach of fiduciary duty and awarded in connection with that claim. We uphold the award of the construction costs damages on that basis.

As to the rents and other payments, we are satisfied the Chancery judge properly supported her finding of unjust enrichment. Turning first to the rent overpayments, the testimony established two issues. First, for at least one year while Matusow was managing the practices, Garrison had inexplicably made thirteen monthly rent payments to the LLC instead of twelve. McLaughlin testified he was unaware of this until after Matusow left.

The second rent issue was that Matusow unilaterally ordered a rent increase to be paid to the LLC for six to eight months without the agreement of the other doctors or a change to the lease. Matusow contends in his brief that

"[e]veryone – even the accountant Mr. Scelsi – agreed that an understanding was reached whereby the rent would be increased and that Dr. McLaughlin and Dr. Izanec would receive a corresponding increase in their draws."  However, the record does not show a common understanding or agreement on this point.

Scelsi testified that: (1) "there was a time when there was consideration given" to Byrne's plan to increase the rent payments from the practices to benefit Matusow with a corresponding compensation benefit to McLaughlin and Izanec; and (2) increased rent was actually paid for a period of six to eight months before it "reverted back to the old rent payments."  But he stated an agreement to increase the rent was never "formalized," and he admitted that giving corresponding bonus checks to the other doctors to offset the rent increase was "talked about", but "[t]hat never happened."

McLaughlin testified that Matusow directed the rent increase without the agreement of the other doctors and without changing the lease.  The court's finding that there was an overpayment of rent, not agreed to by defendants that conferred a benefit on Matusow is supported by the evidence.

The remaining payments included in the unjust enrichment damages award involved: (1) costs as to which the practices paid the LLC 100% even though they only leased 81% of the property, specifically for snow removal,

landscaping, electric, gas, water, waste, and security; (2) the LLC keeping the money paid by a podiatrist who sublet a small portion of the practices' space rather than crediting the practices; and (3) costs for landscaping the property of an Aldi supermarket adjoining the property, which was unrelated to and provided no benefit to the practices.[11]

Matusow does not dispute the court's findings that the practices paid the listed costs when they should not have been obliged to do so and that the practices should have been, but were not, credited with rent paid by the podiatrist subtenant. Rather, he contends that unjust enrichment "is a quasi-contractual doctrine that is not availing to a party to a contract" and he personally received no benefit.

"It has been said that '[q]uasi-contract liability [should] not be imposed . . . if an express contract exists concerning the identical subject matter.'" Shalita v. Twp. of Washington, 270 N.J. Super. 84, 90 (App. Div. 1994) (alterations in original) (quoting Suburban Transfer Serv. v. Beech

---

[11] The Aldi landscaping payments were made directly to Gary's Lawn Service from May 2011 through November 2016. The record does not explain why Matusow arranged for the payment of $42,366.65 to cover the costs of a neighboring business's landscaping other than McLaughlin's testimony where he said he learned that it was for "I guess an easement," and was a cost that Matusow or the LLC "maybe . . . had some legal obligation to pay."

A-1796-19

Holdings, Inc., 716 F.2d 220, 226-27 (3d Cir. 1983)). See also C. B. Snyder Realty Co. v. Nat'l Newark & Essex Banking Co. of Newark, 14 N.J. 146, 163 (1953) ("An implied contract cannot exist when there is an existing express contract about the identical subject.") (quoting Moser v. Milner Hotels, Inc., 6 N.J. 278, 280-81 (1951)).

We are not persuaded by Matusow's argument. Matusow was not a party to the lease or any other contract with the practices that addressed the subject of the payments and credits at issue. He had an employment agreement with the practices, but that was not on "the identical subject" as the unjust enrichment claim. Thus, no contract existed to bar defendants' unjust enrichment claim.

As to the issue of a benefit, Matusow, either purposely or through failure to pay the attention required of him as the practices' president to manage the billing practices, allowed over $207,000 in improper payments to be funneled directly to the company of which he was the sole owner. Similarly, he failed to properly credit the practices with over $7600 in rent paid by a subtenant. Even if negligent rather than intentional, Matusow's failure to discover and put a stop to these improper billing practices benefited him and his company to the detriment of the practices. We discern no reason to disturb the unjust enrichment award regarding the described overpayments and charges.

D.

We turn then to the issue of attorney's fees. Matusow asserts defendants are not entitled to attorney's fees under N.J.S.A. 14A:12-7(10) because defendants did not "even attempt to prove the requisite elements of arbitrariness, vexatiousness, or bad faith" as required under the statute.

An award of attorney's fees under N.J.S.A. 14A:12-7(10) is discretionary. Torres v. Schripps, Inc., 342 N.J. Super. 419, 438 (App. Div. 2001). However, an award cannot be sustained absent "a finding of arbitrariness, vexatiousness, or lack of good faith." Belfer, 322 N.J. Super. at 146.

We are satisfied the Chancery court did not abuse its discretion in its award of counsel fees. The judge considered the fee application under the appropriate standard. She found Matusow did not act in bad faith in litigating the practices' decision to terminate him. However, she did determine that aspects of the verified complaint and order to show cause were arbitrary, and that the separately filed landlord tenant and collection cases were "vexatious." The judge explained she limited the fee award to those categories of billings. The record reflects the judge was meticulous in her review of each line item and carefully parsed fees related to arbitrary or vexatious conduct from other fees.

A-1796-19

However, because we have concluded that the Chancery court's award of NPI damages should be vacated, the attorney's fee award must be adjusted to remove fees associated with that issue. Because the fees related to the NPI damages were awarded separately during the May 22, 2019 hearing, a remand for a recalculation of fees is not necessary. Instead, we vacate the May 22, 2019 order establishing the $184,292.49 fee award.

We therefore reverse and vacate the provision of the Chancery court's order granting indemnification for the NPI damages and vacate the order granting $184,292.49 in attorney's fees corresponding to those damages. The final judgment is affirmed in all other respects.

Any remaining arguments not specifically addressed in the opinion are of insufficient merit to warrant discussion in a written decision. R. 2:11-3(e)(1)(E).

Affirmed in part, reversed in part, and vacated in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1796-19